**HARRIS CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 86–255.**

United States District Court, District of Columbia.

Feb. 19, 1986.

814

David V. Anthony, Irving Jaffe, Joseph K. Weiner, Pettit & Martin, Washington, D.C., for plaintiff.

Mary Coster Williams, Asst. U.S. Atty., Edward France, III, Army Judge Advocate General Corps, for defendants.

John S. Pachter, Arthur I. Leaderman, Stephen R. West, Wickwire, Gavin & Gibbs, Vienna, Va., for intervenor—Magnavox.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

Plaintiff Harris Corporation ("Harris"), a disappointed bidder in a negotiated government procurement, challenges a contract awarded on December 23, 1985 by the Secretary, Department of the Army to the Magnavox Electronic System Company ("Magnavox"). Magnavox requested and was allowed to intervene as a defendant shortly after the complaint was filed. In a complaint filed on January 28, 1986, Harris seeks a declaratory judgment that the contract award violated applicable procurement laws and regulations, the terms of the solicitation, and thus was unlawful and void. Preliminary and permanent injunctive relief is also sought to enjoin continued performance on the contract and compelling the Secretary of the Army to cancel the contract with Magnavox. The plaintiff alleges that the proposal of Magnavox was not in accordance with the terms of the solicitation, that the defendants' evaluation was arbitrarily conducted in violation of procurement regulations, and that the contract award violated Federal Acquisition Regulations, 48 C.F.R. § 15.100 *et seq.* (1984), and the Competition in Contracting Act, 41 U.S.C.A. § 251 *et seq.* (West Supp. 1985).

On January 29, 1986, a temporary restraining order was issued and was later extended to February 18, 1986. On February 12, 1986, the parties presented extensive oral argument on the plaintiff's motion for a preliminary injunction and the defendants and the intervenor's motions for summary judgment. The matter was then taken under advisement. The Court gave full consideration to the argument of counsel, their legal memoranda in support of and in opposition to the pending motions, the supporting documents and exhibits, and the deposition testimony of several key Army personnel involved in the procurement award.[1]

---

1. Prior to argument on the motion for preliminary injunction, plaintiff's counsel was granted permission to depose the Source Selection Authority, General Robert Morgan, the Chairman of the Source Selection Advisory Council, Colo-

nel Alan McCahan, the Chairman of the Source Selection Evaluation Board, Mr. Robert Whitman, and the Contracting Officer, Captain Donald Satterfield.

On February 18, 1986, the Court entered an order denying the plaintiff's motion for a preliminary injunction and stated that the justification for that ruling would follow. The reasons supporting that determination are set out in this Memorandum Opinion. The Court also determines at this time that the motions of the government and Magnavox for summary judgment should be granted and the Harris complaint dismissed.

## BACKGROUND

The Army's procurement called for the design, manufacture, and test of 15 engineering development models of ground-based satellite communications terminals, known as Single Channel Objective Tactical Terminal ("SCOTT"). The SCOTT program is a significant part of the national defense effort, allowing the Army to operate in a global satellite communications system, the MILSTAR EHF Satellite Communications System. The original Request for Proposal ("RFP") was issued in September 1983 by the United States Army Communications-Electronics Command ("CECOM"). That RFP called for production of a much larger number of terminals based on a model designed through other sources. In early 1985, CECOM determined that further research and development should be sought before entering into a large production contract, and in June 1985 the RFP was amended. The amendment changed the solicitation to one with more emphasis on research and development efforts.[2]

Three companies, Harris, Magnavox, and Ford Aerospace, submitted proposals. Thereafter, during the procurement process, they engaged in discussions and negotiations with CECOM representatives. Five factors were identified in the RFP as major areas for evaluation. In order of importance, the factors were Technical Approach, Integrated Logistics Support ("ILS"), Management, Design to Unit Production Cost/Operations and Support Costs ("DTUPC"), and Price.[3] The Harris, Magnavox, and Ford Aerospace proposals were evaluated by a Source Selection Evaluation Board ("SSEB"),[4] a group of about thirty specialists divided into teams according to the five areas. The SSEB evaluators generated lengthy written evaluations of each element of the proposals.[5] In addition, they gave one of the following adjectival ratings to each factor, subfactor and element: superior, excellent, acceptable, capable of being made acceptable, or unacceptable. They also assigned a risk rating of low, moderate, or high to each element.

After the evaluation of the initial proposals, the Contracting Officer arranged for and presided over discussions and negotiations with each offeror and conveyed requests for additional written information from the evaluators. As a result of these discussions and negotiations, revised proposals were submitted by the offerors. The SSEB then conducted intermediate evaluations of the revised proposals and further discussions ensued, based on those evaluations. In September 1985, after all negotiations were complete, the three competitors submitted Best and Final Offers ("BAFOs"). The SSEB performed a final evaluation and submitted its ratings to the Source Selection Advisory Council ("SSAC").

The SSAC, chaired by Colonel Alan McCahan and consisting of six technical

---

**2.** The restructuring of the procurement was announced in a superseding amendment to the RFP, Amendment 39.

**3.** Each factor consisted of at least two subfactors, and many subfactors were divided into elements. For example, the Management factor consisted of three subfactors—past/current performance, facilities and personnel, and project control; past/current performance had nine elements.

**4.** The SCOTT procurement was carried out under a "formal" source selection process as defined in the Federal Acquisition Regulations, 48 C.F.R. § 15.622(a). The Chairman of the SSEB, Robert Whitman, prepared a draft source selection plan in April 1985, recommending the procedures for the evaluation process. *See* 48 C.F.R. § 15.622(c).

**5.** The SSEB evaluators rated individually the elements in the technical approach and ILS areas, but not the elements of the management factor.

experts in fields relevant to the procurement, met in October 1985 to consider the three proposals and the evaluations prepared by the SSEB. It devised numerical ratings for each major factor from the SSEB's adjectival ratings of the proposals, based on a mathematical formula that reflected the weights given to the various factors and subfactors by the Evaluation and Award Plan ("Plan").[6] The scores were made part of a report submitted on November 7, 1985 to Major General Robert D. Morgan, the Source Selection Authority ("SSA"). General Morgan issued a Memorandum of Decision on December 23, 1985, awarding the contract to Magnavox on the basis of his determination that its proposal offered the best value to the government. Harris became aware of the decision on December 27, 1985.

Harris, which had proposed the lowest total price of the three offerors, immediately requested a debriefing from the government on the evaluation of its proposal. According to Harris employees, the Army representatives at the debriefing made various statements that called into question the fairness, impartiality, and presence of a rational basis for the evaluation process and contract award. The debriefing took place on January 14, 1986, beyond the date before which Harris could obtain an automatic stay of the contract award, under the Competition in Contracting Act, by filing a protest with the General Accounting Office. 31 U.S.C.A. § 3553(d)(1). Because of the time constraints, Harris filed suit seeking declaratory and injunctive relief from this Court.

## ANALYSIS

## I

## THE MOTION FOR PRELIMINARY INJUNCTION

Before granting a preliminary injunction, the Court must assess four factors: (1) whether the petitioner has a strong likelihood of prevailing on the merits; (2) whether the petitioner would be irreparably harmed by the denial of an injunction; (3) whether the injunction would substantially harm the interest of other parties to the proceeding; and (4) whether the injunction is in the public interest. *Virginia Petroleum Jobbers Ass'n v. FTC*, 259 F.2d 921, 925 (D.C.Cir.1958); *see also Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C.Cir.1977). From all that has been advanced in the legal memoranda and oral arguments of counsel, it appears that the first and fourth factors have been stressed and thus call for careful attention.

## A. The Merits of Plaintiff's Claims

It is noted preliminarily that while our Circuit Court has long recognized that bidders have standing to challenge government procurement decisions, *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), at the same time it has cautioned against unnecessary judicial intervention in the procurement process. Indeed, a narrow standard of review has been approved in government procurement litigation. The disappointed bidder

> bear[s] a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973); *see also M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). The Court must exercise with restraint its power to overturn procurement decisions and recognize the discretion of agency officials and the

---

**6.** The RFP specified the order of importance of the major factors and identified all of the subfactors and elements to be evaluated. It did not, however, divulge the actual weights of the factors. The weights, determined in May 1985 by the SSAC when it reviewed and revised SSEB Chairman Whitman's draft plan, were as follows: Technical—35, ILS—22, Management—20, DTUPC—13, Price—10.

"strong public interest in avoiding disruptions in procurement." *Id.* at 1300. Under this exacting standard, the plaintiff Harris has failed to make a substantial showing that it is likely to prevail on the merits. Indeed, the government's case is so strong that summary judgment must be granted to it and the intervenor Magnavox.

Harris has raised a number of challenges to the evaluation process and decisions of the Army, attempting to show that the contract award to Magnavox was without rational basis. Each will be considered in turn.[7]

### 1. The Evaluation of the Technical Proposals

 While many of plaintiff's claims evaporated during the short but intense course of this proceeding, and others arose spontaneously on the eve of oral argument, one challenge has always been advanced. Harris argues that Magnavox was evaluated more favorably on its technical proposal because it went beyond the government's minimum requirements as outlined in the RFP. It characterizes this type of scoring as the awarding of "extra credit" or "brownie points." Relying on selected GAO decisions, Harris states that this procedure was unlawful. The government and Magnavox defend the evaluation of the technical proposals as a reasonable and lawful method for determining which company was providing the best value to the Army, emphasizing the complex, technical nature of the procurement. They dispute Harris' characterization of the process; rather than awarding "extra credit," they argue, the evaluators were simply making quality distinctions between the proposals.

Harris' claim is strikingly similar to plaintiff's argument in *American District Telegraph v. Department of Energy,* 555 F.Supp. 1244, 1249 (D.D.C.1983). The proceeding involved a procurement for the design and installation of an alarm system in a chemical processing plant administered by the Department of Energy. The court held that since the solicitation clearly emphasized the importance of technical criteria as opposed to or in addition to price, it was perfectly rational for the government to select the most technically advantageous proposal, and the solicitation could not be reasonably interpreted to prohibit a bidder from submitting a proposal in excess of the technical specifications of the RFP. In *Marine Research, Inc.,* Comp.Gen. B–206271, 82–2 CPD ¶ 380 (1982), the Comptroller General in a similar situation denied a protest by an offeror that argued it should have received the maximum score for meeting the government's minimum requirements. The Comptroller ruled that the RFP put offerors on clear notice that the agency would differentiate qualitatively among proposals on basis of technical merit and that those which only minimally satisfied the RFP would not rank as high as those which exceeded minimum requirements. *See also Mutual of Omaha Insurance Co.,* Comp.Gen. B–203338.2, 82–2 CPD ¶ 268, at 5–6 (1982). ("[W]e find that offerors are on notice ... that qualitative distinctions will be made among proposals where technical factors are part of the competitive evaluation.")

The communications between the Army and the offerors in the procurement here are strewn with explicit indications that the technical aspects of the proposals would be competitively evaluated. Captain Satterfield's cover letter to a draft specification sent to the competitors prior to the amended solicitation of June 1985 states in part:

2. The Lincoln Labs Advanced Development Model referenced in this draft specification represents *an* approach to meeting the operational/performance requirements. The government wants the contractor to understand that in his technical proposal he has the freedom to address this approach, an alternative approach, or any combination thereof which

---

7. Plaintiff has moved to amend its complaint to bring claims of which it was not aware prior to discovery. So that all relevant issues may be considered, and in the interests of justice, the motion is granted. Fed.R.Civ.P. 15(a).

he feels will best meet the needs of the Government.

3. The contractor must understand that while he has freedom in the type of technical approach he chooses, his approach must meet all operational/performance requirements within the government. specification to be considered acceptable.

Defendant's Exhibit 1 (emphasis in original).[8] The RFP itself lists technical approach as the most important factor in the award decision. Price is the least important factor. RFP, § M.1.[9]

In addition, the Executive Summary of the RFP stated:

Contract award may not necessarily be made to an offeror who submits the lowest priced technically acceptable proposal. The Government intends to place an award with the offeror that provides that best *overall* proposal meeting the stated requirements. No advantage will accrue to an offeror who submits an unrealistically low price.

RFP, Executive Summary at 3. (emphasis in original). The RFP also emphasizes the "technical freedom" allowed to the offerors. It states:

The contractor has complete freedom in his technical approach to meeting the needs of the Government in his contract. This freedom includes the ability to propose different technical solutions than that provided in the specification SCA–2301B. Additionally, the contractor has the flexibility to propose deviations in the recommended type shelter identified by the Government.

RFP, § H.211(a).

In arguing that the government was asking for a "minimum requirement, low-cost, 'no-frill' product," Plaintiff's Memorandum in Support of Motion for Preliminary Injunction at 20, Harris relies heavily on § H.211(c) of the RFP which states that "[r]educing the overall cost of the SCOTT program is of prime importance to the Government." The key word here, however, is "overall." The section addresses the importance of the DTUPC factor, not Price, and goes on to warn offerors not to lower their DTUPC estimates at the "expense of exorbitant operation and support costs."

The plaintiff's single reference in support of its assertion that all the government wanted was a minimally acceptable proposal is barely convincing standing alone, much less when measured against the entire record. In this procurement, the government was buying the development of a sophisticated technology to be integrated into a sensitive national defense project. It would have been inappropriate to ignore quality distinctions among the proposals. Harris' interpretation to the contrary is irrational and misplaced.

It should be noted also that government witnesses in deposition testimony provided yet another reasonable characterization of the rating of technical proposals that exceeded the government's minimum specifications in certain areas. Both Captain Satterfield and Mr. Whitman indicated that such proposals deserved higher ratings because the government could be more confident that the offeror would in actual practice meet the minimum requirements. Satterfield Dep. at 60; Whitman Dep. at 105. Given the uncertainty and complexity of the technologies involved, such application of the rating criteria makes good sense.

### 2. The Evaluation of Risk

■ Harris' next advances a series of challenges to the use of risk by the SSEB as an evaluation criteria. First, it complains that since the Plan's definitions of the adjectival ratings include discussions of risk, they are incompatible with the use of independent risk ratings. For example, part of the definition of "Excellent" is that

---

8. Unless otherwise noted, citations to Exhibits refer to the exhibits used in the depositions conducted by the plaintiff.

9. It should be noted also that the Price factor consisted of the subfactors of total price and cost realism. Thus, under the weighting system, total price accounted for only 5 percent of the total evaluation score. *See supra* note 6.

the "proposed approach exhibits low risk to the Government." Plaintiff's Exhibit 1, § IV.B. Harris argues that the SSEB evaluators could not have rationally given this rating to an element of a proposal and also assigned a risk rating of moderate or high. Next, the plaintiff points out that the weights for risk—that is, the influence of risk on the mathematical formula used by the SSAC—were not established until after the SSEB evaluation reports were transmitted to the SSAC. This, argues Harris, gave the SSAC the opportunity to influence the outcome of their deliberations by manipulating the weighting of risk. Finally, the formula used to apply the risk evaluations is challenged as mathematically unsound and otherwise flawed.

The government responds initially that it is rational and proper to consider risk in a procurement of this type. This is certainly true, even though risk was not identified as an evaluation factor in the RFP. *See Consolidated Group,* Comp.Gen. B–220050, slip op. (Jan. 9, 1986) ("[W]e find no basis for objecting to the evaluation of the risk of performance problems because the degree of risk present is clearly related to the approach used and the ability of the firm to perform the contract."). But the plaintiff challenges the *way* that risk was considered and applied in the evaluation process. To uphold that challenge, the Court must determine that the flaws in the evaluation of risk undercut any rational basis for the decision to award the contract to Magnavox or involved a clear violation of procurement regulations that was prejudicial to Harris. *Kentron Hawaii,* 480 F.2d at 1169. The record in this case simply does not support such a finding.

First of all, while the definitions of adjectival ratings are not a model of clarity, there is no reason to believe that the SSEB evaluators were confused by them or unable to apply them rationally. The Plan clearly stated that each factor was to be given an adjectival rating and a separate risk assessment and that "the degree of risk of the approach does not itself establish the rating." Plaintiff's Exhibit 1, § IV.B. Colonel McCahan, expressed some

concern about the amount of subjectivity involved in risk assessment. *See* McCahan Dep. at 71–76; Plaintiff's Exhibit 3, at 4. He stated, however, that a risk rating generally indicated the evaluator's confidence that the contractor would produce at the level for which the adjectival rating was given. McCahan Dep. at 78. Furthermore, and perhaps most importantly, the SSEB reports consisted not only of adjectival ratings and risk assessments, but also of detailed narrative indicating the strengths and weaknesses of each element considered. *See* Plaintiff's Exhibits 6 & 7. These entire reports were considered by the SSAC. McCahan Dep. 40–41. Thus, facial inconsistencies between the adjectival definitions and the risk ratings, which the Court does not find to be substantial in any event, did not have a significant impact on either the SSEB or the SSAC deliberations.

Plaintiff's claim that the evaluation process was tainted because there was a possibility for manipulation of the contract award by altering the numerical weightings for risk similarly does not find support in the record. Neither the Plan nor applicable regulations state when numerical weightings for risk should be established, or that they must be established at all. Army Regulation 715–6, relied on by the plaintiff, states that the SSAC shall "establish criteria weights in order of their relative importance" and "[r]eview the SSEB findings and apply established weights to the evaluations results." Plaintiff's Exhibit 2, at 3–4. It is clear that the SSAC complied with this regulation by establishing weights for the five evaluation factors in the Plan and applying those weights to the SSEB reports. In any event, the use of the risk assessment in the mathematical calculations did not influence the rankings of the three offerors. *See* Declaration of Colonel Alan R. McCahan (Feb. 10, 1986). Thus, even if Army Regulation 715–6 was violated, the violation was not prejudicial to Harris. Plaintiff asserts that even the *possibility* of impropriety in the procurement evaluation is enough to warrant the relief

it seeks. The Court does not agree. Such a result would be completely inconsistent with the exacting standard of review that the Court must apply.[10]

Finally, even assuming the existence of a mathematical error in the SSAC's use of the risk ratings in calculating the numerical scores of the proposals,[11] there is no evidence in the record that the error had any material impact on the scores assigned or on General Morgan's final decision.

### 3. Magnavox's Increased Price Score

██ It was disclosed during discovery that Magnavox's price proposal score was changed after the presentation of the SSAC report to General Morgan on November 7, 1985. According to the government, this was done because it was determined that the SSEB evaluators had improperly downgraded the proposal because of a management decrement.[12] Morgan Dep. at 29–30; Satterfield Dep. at 49–51.

Plaintiff correctly points out that the downgrade is not reflected in the SSEB's final evaluation report on Magnavox's cost realism, which shows a rating of superior with low risk. Plaintiff's Exhibit 7, at 5.2.j. However, an affidavit from the chairman of the SSEB team that evaluated the price factor indicates that an earlier final evaluation, rating Magnavox's cost realism as adequate with high risk, was removed and shredded when the error in evaluation was discovered. A new evaluation form was completed and made part of Magnavox's rating report. Affidavit of John A. Traversone at ¶ 8 (Feb. 10, 1986). The Court finds

this explanation curious in some respects. Shredding the original report and retaining the original date on the revised report is an unusual way of enacting a perfectly legal, above board revision to an evaluation.

In spite of this, however, the increase in Magnavox's score had no impact on the final decision and certainly does not lead to the conclusion that the decision lacked a rational basis. General Morgan testified that he had already made his decision before error was discovered and the change made. Morgan Dep. at 25. And price was the least important factor in the procurement evaluation. In any event, the differences between Harris and Magnavox in the areas of ILS, management, and DTUPC, were more than sufficient to offset Harris' slight advantage in the price component before Magnavox's evaluation was revised.

### 4. Other Challenges

The claims presented by Harris over the course of this proceeding have changed considerably since entry of the Temporary Restraining Order. Plaintiff's final brief barely mentions a number of arguments it stoutly advanced during the first hearing. However, since counsel claimed at the February 12, 1986 argument on the preliminary injunction that no claims have been abandoned, Transcript at 60 (Feb. 12, 1986), and since the defendants' motions for summary judgment as well as the motion for preliminary injunction are also at issue, a brief discussion of those arguments is in order.

---

**10.** Harris' reliance on *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) is misplaced. There the Supreme Court upheld the *government's* decision to cancel a contract because an official participating in the procurement had a financial interest in the winning company. Aside from the obviously greater likelihood of improper conduct, the limits on the court's discretion to interfere in the procurement process were simply not a factor in that case.

**11.** Because it was raised at the last minute, defendants did not have full opportunity to examine the merits of this claim. The Court notes, however, that plaintiff's counsel's inter-

pretation of how the risk ratings were intended to be applied in the mathematical calculation is at least open to dispute. Adding or subtracting .1 to the point score of an element, based on the risk assessment, would seem to be just as logical as changing the score by plus or minus 10 percent.

**12.** A management decrement is an explicit decision to absorb some of the cost of a project rather than include it in a price proposal. Such decisions were permitted by the RFP in its discussion of the evaluation subfactor of cost realism. RFP, § M.3.4.b.(2).

Plaintiff claimed initially that Harris' "past performance" was considered in evaluating cost realism and DTUPC, while the RFP indicated it was a subfactor only in the management area. Affidavits from the chairmen of the price and management teams of the SSEB effectively refute this claim, and Harris failed to develop any evidence during discovery to support it. Similarly, while Harris' employees gathered from the debriefing that the DTUPC factor had been ignored, the detailed SSEB evaluations of Harris and Magnavox in that area and the SSAC's report to General Morgan more than demonstrate the inaccuracy of that charge. *See* Plaintiff's Exhibit 6, at 4.1.a; Plaintiff's Exhibit 7, at 4.1.a, Plaintiff's Exhibit 3, at 13. Thus, the initial claim that the evaluative factors were changed without notifying the offerors is baseless.

Harris also believed that its rating in the ILS area was based on its original proposal rather than its final offer, a claim which, if true, would be a violation of 48 C.F.R. 15.611(d). Again, the documentary evidence and the unchallenged affidavits of SSEB members refute this claim. *See* Affidavit of Jon Ford (Feb. 7, 1986); Plaintiff's Exhibit 7, at 2e–2h. In addition, there is nothing in the record to support Harris' assertion that the government failed to conduct meaningful communications with Harris regarding the deficiencies of its cost realism proposal. The intermediate evaluation report shows that five IFNs (items for negotiations) were issued after the initial evaluation and Harris provided written responses to each. *Id.* at 5.2.d.

█ The original complaint and motion for preliminary injunction challenges the Army's use of cost realism as an evaluation factor since this procurement was for a fixed price contract. Harris also objects to the consideration of its past performance on previous cost-reimbursement type contracts in the evaluation of its management proposal. The Comptroller has held that cost realism is a valid evaluation factor even in procurements where total price is

the primary concern, which is not the case here, because it helps in assessing the offeror's understanding of the government's requirements. *See General Management Systems, Inc.,* Comp.Gen. B–2124246, 84–2 CPD ¶ 351, at 4 (1984). In any event, Harris' claim is untimely. Harris was required to challenge evaluation factors before submitting its BAFO. 4 C.F.R. § 21.2(a)(1) (1985). It had ample opportunity to do so.

In evaluating past performance under the management factor, the Army reviewed 13 prior contracts of Harris considered comparable in complexity to the SCOTT project and which had a contract value of at least $10 million. Affidavit of Keith Maurer, ¶ 7 (Feb. 6, 1986); Plaintiff's Exhibit 7, at 3.1.c. Only five of the 13 contracts were fixed price contracts. The survey of past performance revealed instances where Harris was lacking in cost control. *Id.* at 3.1.d. This information was relevant to an evaluation of Harris' management capabilities even if most of the prior contracts were not fixed price contracts. From such an analysis it cannot be said that the Army's evaluation of Harris' proposal in this regard was improper.

In sum, most of Harris' initial claims in this lawsuit amounted to very little once discovery was obtained. Harris argues that all of the inconsistencies and problems with the procurement that it has identified, when lumped together, lead to the conclusion that the Magnavox award lacked a rational basis. The Court understands that Harris is not required to show that each of its challenges standing alone justifies overturning the procurement, but fails to see how any of the challenges Harris has brought are significant or present a serious question. Harris has failed to make a convincing showing on the merits that would justify issuance of a preliminary injunction.

**B. The Public Interest**

The plaintiff correctly points out that the public has a great interest in seeing that its tax dollars are distributed fairly by government agencies. But the public interest is also served by avoiding disruptions of the

procurement process. *M. Steinhal & Co.,* 455 F.2d at 1300; *see also Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944). This interest is especially great in this case since it involves a project important to national security.[13] On this issue, the Court has noted the public and, particularly, the *in camera* declaration of J.R. Sculley, Assistant Secretary of the Army. The government's, and therefore the public's, interest in having this particular contract proceed according to schedule weighs heavily in the balance. A much stronger case on the merits than the plaintiff has presented would be necessary to counter-balance the public interest in this case.

## II

## THE MOTIONS FOR SUMMARY JUDGMENT

To prevail on their motions for summary judgment, the government and the intervenor must demonstrate that there are no material facts presenting a genuine issue for trial and that, as a matter of law, they are entitled to judgment. *Goodrich v. Int'l Brotherhood of Electrical Workers,* 712 F.2d 1488, 1494 (D.C.Cir.1983); *Perry v. Block,* 684 F.2d 121, 126 (D.C.Cir.1982). Plaintiff claims that factual issues still exist because the government witnesses have merely denied what Harris' representatives say they were told at the debriefing. But beyond the affidavit attached to the original complaint that relates plaintiff's version of the events at the debriefing, Harris has developed only the slightest evidence that supports its claims. While all inferences from the factual material before the Court must be drawn in favor of Harris, a mere denial or recitation of conclusory allegations is insufficient to raise a genuine issue of material fact where the record does not support those allegations. *Briggs v. Goodwin,* 698 F.2d 486, 489 n. 2 (D.C.Cir. 1983), *rev'd on rehearing on other grounds,* 712 F.2d 1444 (D.C.Cir.1983);

*Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir.1973).

A number of uncontroverted affidavits have been submitted by the government. They relate to the central issues in this litigation and are more than sufficient to show that the Army's decision had a rational basis and was not arbitrary and capricious. The plaintiff has not demonstrated that there are unresolved material facts which preclude the relief sought by the defendants and the intervenor. Summary judgment for the government and the intervenor Magnovox is appropriate as a matter of law.

An order consistent with the above Memorandum Opinion is entered as of this date.

---

13. Claims of national security, of course, are often advanced by the government in challenges to procurement decisions. The Court will not blindly accede to such claims, but is bound to give them the most careful consideration. *Cf.* 28 U.S.C. § 1491(a)(3).