OTI AMERICA, INC., Plaintiff,

v.

UNITED STATES, Defendant.

No. 05–904C.

United States Court of Federal Claims.

Filed Under Seal: Nov. 30, 2005.

Reissued: Dec. 7, 2005.

William M. Weisberg and Beth L. Jacobson, Sullivan & Worcester LLP, Washington, D.C. for plaintiff. With them on the briefs was Joshua L. Solomon, Sullivan & Worcester LLP, Boston, MA.

Richard B. Evans, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, Commercial Litigation Branch, and Donald E. Kinner, Assistant Director, Washington, D.C. Of counsel was Jennifer R. Seifert, Assistant General Counsel, Government Printing Office, Washington, D.C.

**OPINION AND ORDER** [1]

LETTOW, Judge.

This bid protest concerns the development of electronic passport covers for use by the Government Printing Office ("GPO") and the Department of State ("State Department"). Plaintiff, OTI America, Inc. ("OTI"), filed this action to challenge a decision by GPO that it would no longer purchase additional samples and prototypes from OTI for evaluation. OTI and seven other entities had entered into matching contracts with GPO to develop and provide samples of book covers for new electronic U.S. passports. The action to discontinue purchase of samples and prototypes from OTI was part of the process at GPO of winnowing these contractors down to several that would ultimately provide full production of electronic covers for new U.S. passports.

The court previously rejected a motion to dismiss filed by the government contending that OTI's claim was improperly presented as a bid protest and instead should have taken the form of a garden-variety suit for breach of contract. *See OTI America, Inc. v. United States,* 68 Fed.Cl. 108, 115 (2005) ("*OTI I* ") (holding that a bid protest was a jurisdictionally appropriate means of addressing an agency's selection decisions "in cases where the terms of existing contracts are used to conduct a competition resulting in the elimination of competitors for the agency's requirements for the duration of the contracts in question") (quoting *Matter of Electro–Voice, Inc.,* B–278319, B–278319.2, 98–1 CPD P 23, 1998 WL 14952 (GAO Jan. 15, 1998)).

After the expedited jurisdictional decision in *OTI I,* the parties addressed the merits of the case on an accelerated briefing and trial schedule. Pending before the court are OTI's and the government's motions for judgment on the administrative record. On November 7, 2005, the court completed the record for decision by hearing arguments on administrative issues and conducting a trial concerning equitable issues.

For the reasons set forth below, the court finds that there were errors in GPO's procurement of electronic passport covers that materially prejudiced OTI. Applying 28 U.S.C. § 1491(b)(2), the court orders a limited measure of equitable relief, requiring that GPO reinstate OTI and resume testing OTI's products at the same contractual stage at which OTI was previously and improperly eliminated. The court emphasizes that this order neither prohibits nor inhibits GPO and the State Department from proceeding in the ordinary course with other aspects of the electronic passport program, including purchasing products from other contractors and initiating a pilot program using electronic covers produced by [* * * *].

**FACTS** [2]

On July 12, 2004, GPO issued Solicitation GPO–EP2004 ("Solicitation") for the purpose of procuring materials, to be provided during one base year plus four option years, for a new electronic U.S. passport. AR 25, 30–31 (Solicitation §§ C1.2.1, C4.1–C4.5).[3] Specifically, GPO sought to obtain "sheets of book covers ... consist[ing] of an inlay containing an [International Organization for Standardization] ... compliant contactless [Integrated Circuit]/antenna assembly adhered to passport book cover stock." AR 29 (Solicitation § C4).

The development of a new electronic U.S. passport is part of a cooperative effort among a substantial group of nations, 27 of which have joined with the U.S. in a Visa Waiver Program ("Program"). Section 303 of the Enhanced Border Security and Visa

---

1. This decision was originally issued under seal because it contained "confidential or proprietary information" within the meaning of Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4. In accord with a request by the court set out in the conclusion, the parties reviewed this decision and provided proposed redactions of confidential or proprietary information. The resulting redactions by the court are represented by brackets enclosing asterisks "[* * * *]."

2. The recitations that follow constitute findings of fact by the court drawn either from GPO's administrative record of the procurement or from the trial before the court of equitable issues. "Tr." refers to the trial transcript.

3. "AR" refers to the Administrative Record provided to the court.

Entry Reform Act of 2002, Pub.L. No. 107–173, 116 Stat. 543, 553 (2002) (codified, as amended, at 8 U.S.C. § 1732), requires that participating countries have "a program to issue to its nationals machine-readable passports that are tamper-resistant and incorporate biometric and document authentication identifiers that comply with applicable biometric and document identifying standards established by the International Civil Aviation Organization." AR 24 (Solicitation § C1.1); 8 U.S.C. § 1732 (2005). As originally envisioned, cooperating countries had until October 26, 2004 to establish an electronic passport program. 8 U.S.C. § 1732 (2002). Nationals of non-cooperating nations would be required to apply for a visa prior to entering the United States. *See* 8 U.S.C. § 1732; *see also* Plaintiff OTI America, Inc.'s Motion for Judgment on the Administrative Record ("Pl.'s Mot.") at 2. Foreign nationals who are required to obtain visas would receive "machine-readable, tamper-resistant visas and other travel and entry documents that use biometric identifiers" issued by the Attorney General and the Secretary of State. 8 U.S.C. § 1732(b)(1). On August 9, 2004, Congress extended the time to begin to use electronic passports to October 26, 2005. Act of Aug. 9, 2004, Pub.L. No. 108–299, § 1, 118 Stat. 1100 (2004) (amending 8 U.S.C. § 1732).

Subsequently, the government determined that most nations participating in the Program would be unable to satisfy the new timeline. Defendant's Motion for Judgment Upon the Administrative Record ("Def.'s Mot.") at 4. Thereafter, in consultation with Congress and the United Nations-affiliated International Civil Aviation Organization ("ICAO"), the Department of Homeland Security announced on June 15, 2005, pursuant to the Secretary of Homeland Security's powers under Section 217 of the Immigration and Nationality Act, 8 U.S.C. § 1187,[4] that cooperating countries would only need to produce passports with digital photographs by the amended timeline. Def.'s Mot. at 4. Participants in the Program would, however, be called upon to present an "acceptable plan to issue passports with integrated chips by October 26, 2006." *Id.* The Department of Homeland Security found this interim arrangement to be an acceptable course of action because ICAO had adopted biometric requirements only as a "technical specification," not as a standard, and Section 303 of the Enhanced Border Security and Visa Entry Reform Act mandated the implementation of a passport program incorporating technology standards. *See* 8 U.S.C. § 1732(c).

The United States is under no explicit obligation to abide by the new requirements applicable to visa-waiver nations under 8 U.S.C. § 1732. Def.'s Mot. at 5. Nevertheless, for the purposes of international comity, the presumption of reciprocal privileges, and increased border security, the United States has undertaken the task of applying to itself the new electronic passport requirements. AR 24–25 (Solicitation § C1.1). The U.S. Electronic Passport Program was thus created with the goal of satisfying the same timelines as those being undertaken by Visa Waiver Program participants. Def.'s Mot. at 5.

The Solicitation "established a competition among qualifying offerors" based upon "multiple [identically-issued] contracts, each containing sequential qualifying steps, for development of an electronic passport, preparation and testing of prototypes and a final procurement of electronic passport covers." *OTI I,* 68 Fed.Cl. at 111.[5] The Solicitation stated that a contract would be awarded to those "[o]fferor(s) whose proposal is the most advantageous to the [g]overnment, price and other factors considered." AR 205 (Solicitation § M.1(a)). Eighteen proposals were submitted to GPO in response to the Solicitation and contracts were awarded to eight

---

**4.** Under Section 217 of the Immigration and Nationality Act, 8 U.S.C. § 1187, the Secretary of Homeland Security must "determine that a country's participation in the [Visa Waiver Program] will not compromise United States law enforcement and security interests—and may therefore establish conditions to protect United States law enforcement and security interests." Def.'s Mot. at 5.

**5.** Notably, GPO did not initially choose this method of procurement for selecting electronic passport book covers. *See OTI I,* 68 Fed.Cl. at 111 n. 7.

different companies,[6] including OTI. AR 209 (E-mail from Albertha M. Broadnax, Contracting Officer, GPO, to Ohad Bashan, President and CEO, OTI (Dec. 20, 2004)), 450 (E-mail from Broadnax to Bashan (Jan. 12, 2005)), 508 (Testing Matrix (June 2, 2005)).[7]

Each contract contained various line-item numbers ("CLINs") that indicated the products or services that the government would order during the stages of testing and evaluation. AR 7–18 (Solicitation § B3). The government stated explicitly that it would order the minimum amount under those CLINs listed as mandatory, but that it reserved the right to purchase any amount, or none at all, under optional CLINs. AR 6 (Solicitation § B2). Ultimately, the Solicitation announced that while a single award of full production of the electronic passport book covers was "possible," multiple awards were "anticipated." *Id.* (Solicitation § B1.2). GPO stated that it plans to "make a high volume purchase of book covers . . . from one awardee and lower volume purchases of book cover[s] . . . from the other awardees." AR 27 (Solicitation § C1.2.8).

The procurement created a competition consisting of a "framework built around stages of [identically-]issued contracts," *OTI I*, 68 Fed.Cl. at 117, whereby contractors would supply sample electronic passport book covers during four stages prior to GPO's ultimate "full agency deployment." AR 28, 40–44 (Solicitation §§ C1.3.4, C7.2.3.1). Initially, contractors certified and provided evidence that their proposals were "durable, interoperable, secure and [met] the applicable standards," which certification and evidence were subject to verification by the government. AR 41 (Solicitation § C7.2.3.1). Subsequently, upon completing stage one, each of the contractors provided the govern-

ment with seven Personalization System Test Kits and 700 electronic passport book cover sheets each containing 3 book covers per sheet. AR 7 (Solicitation § B3). During stage two, government agencies conducted tests in 6 distinct phases on the products provided by the contractors. AR 41–43 (Solicitation § C7.2.3.1). During the first three phases, GPO inspected the personalization system test kits, verified the effectiveness of the embedded chips, and recorded the products' success rate during the "UNO book fabrication process." AR 41, 206 (Solicitation §§ C7.2.3.1, M.2.2).[8] In phases four and five, the sample electronic passport book covers were given to the State Department, which tested them for compatibility with their printers, chip personalization, security, and fraud prevention. AR 41–43, 206 (Solicitation §§ C7.2.3.1, M.2.2). Finally in phase 6, the State Department, through the National Institute for Standards and Technology ("NIST"), subjected the contractors' products to various physical tests to determine their durability. AR 42–43, 206 (Solicitation §§ C7.2.3.1, M.2.2). Sample products that successfully passed all six phases of testing at stage two could advance to the next stage, at which time GPO could decide whether or not to exercise its option on the next CLIN to one or multiple parties. AR 26 (Solicitation §§ C1.2.6, C1.2.7).[9]

During stage three, one or more contractors selected by the government would provide up to 60,000 electronic passport book cover sheets that would be used in two six-month pilot programs: one would be the Special Issuance Agency ("SIA") Pilot for travel by government employees and the other would be a Domestic Agency Pilot for a limited number of private U.S. citizens at certain designated airports. AR 8–9, 26, 43–

---

6. One of these companies, [* * * *].

7. The Testing Matrix sets out a summary of the results conducted on the contractors' products. AR 237, 508. The reliability and value of the Matrix has been questioned by senior officials at GPO. *See, e.g.,* Hr'g Tr. 21:4–7 (Oct. 12, 2005); Defendant's Reply to Plaintiff's Response to Defendant's Cross–Motion for Judgment Upon the Administrative Record ("Def.'s Reply") Ex. A (Deposition of Michael C. Emery (Oct. 28, 2005)) at 128:7–22, 134:18–22 (indicating that the document was created by a State Department con-

tractor, was not relied on by GPO, and is "completely out of whack").

8. The "UNO line" in effect assembles the covers into passport books. *See* AR 286 (E–Passport Evaluation Plan § 3.2.1).

9. The products of [* * * *]. Tr. 139:11–16, 145:25 to 146:5 (Test. of Frank E. Moss, Deputy Assistant Secretary of State, Bureau of Consular Affairs, Passport Services).

44, 206 (Solicitation §§ B3, C1.2.6, C1.2.7, C7.2.3.1, M.2.2). Moreover, additional laboratory testing could be performed during this stage to determine the products' structural integrity, resistance to chemicals and environmental factors, and expected life-span. AR 44 (Solicitation § C7.2.3.1). During stage four, the government "reserve[d] the right to perform [various] verifications" on the sample book covers, including testing for quality, durability, and new configurations, plus random sampling. *Id.*

Following the completion of these four stages, GPO would begin "full agency deployment." AR 24, 28 (Solicitation §§ C1.1, C1.3.4). The government, through the Solicitation, stated that the "results of all the lab and field testing, in conjunction with offered costs, will be used in choosing products for Full Agency Deployment." AR 206 (Solicitation § M.2.2). Ultimately, GPO expects to issue "durable and secure" electronic passports to domestic agencies that did not participate in the SIA Pilot; GPO anticipates that more than eight million new electronic passport covers will be needed each year by issuing agencies such as the State Department's Bureau of Consular Affairs. AR 24, 28 (Solicitation §§ C1.1, C1.3.4).

On August 12, 2004, OTI submitted a proposal in response to the Solicitation. AR tab E (OTI Proposal (Aug. 12, 2004)). Initially, GPO decided to award contracts to four offerors, but not to OTI. AR 209 (E-mail from Broadnax to Bashan (Dec. 20, 2004)). Following the filing of a bid protest by OTI with the Government Accountability Office ("GAO"), which was ultimately withdrawn, Ms. Broadnax announced that contracts were awarded to four additional vendors including OTI. Pls.' Mot. at 3; AR 450 (E-mail from Broadnax to Bashan (Jan. 12, 2005)).

GPO subsequently ordered from OTI, and OTI delivered, sample electronic passport book covers for testing at stage two of the contract. Def.'s Mot. at 8. During testing conducted on February 17 and 18, 2005, the government discovered two defects with OTI's product: namely, [* * * *]. AR 210 (Letter from Broadnax to Bashan (Mar. 16, 2005)); AR 236 (Results from OTI first test run (Feb. 17–18, 2005)); *see* AR 391 (Test Results from OTI Test Phase 3 (First Cycle) (Feb. 18, 2005)).[10] GPO subsequently sent a "cure notice" to OTI informing them of the testing failures, providing ten working days to submit corrected sample electronic book covers, and stating that "[i]f the adjusted product fails to pass testing a second time, GPO will no longer consider OTI's products for use in the SIA Pilot (CLIN 5) of" the contract. AR 210 (Letter from Broadnax to Bashan (Mar. 16, 2005)).

Within the allotted time, OTI delivered a second set of book covers to GPO that no longer suffered from the aforementioned flaws. Pl.'s Mot. at 4; AR 398–99 (Test results from OTI Test Phase 3 (Second Cycle) (Apr. 22, 2005)). GPO certified that OTI's products passed the first two testing phases, AR 235 (Results from OTI second test run (Apr. 18–25, 2005)); *see* AR 393–94 (Test results from OTI Test Phase 1 (Second Cycle) (Apr. 19, 2005)); AR 395–97 (Test results from OTI Test Phase 2 (Second Cycle) (Apr. 19, 2005)), but the government then discovered that OTI's covers exhibited a different defect. AR 235 (Results from OTI second test run); *see* AR 398 (Test results from OTI Test Phase 3 (Second Cycle) (Apr. 22, 2005)). GPO observed that OTI's book covers began to separate "between the cover and the inlay material" due to a flaw in the adhesive provided by OTI. AR 235; *see* AR

---

10. Just as with the Testing Matrix, the accuracy and reliability of the Test Reporting Charts, AR 374–85, 387–446, has been questioned. Def.'s Reply Ex. A (Deposition of Michael C. Emery (Oct. 28, 2005)) at 105:9–11, 106:24 to 110:1, 125:14 to 126:13, 126:23 to 127:24, 134:5 to 135:12 (stating that the forms, created by a State Department contractor, are not accurate and are a "waste of time and effort"). The only documents GPO created that discussed formal testing results were synopses developed when the contractors' products failed. Def.'s Reply Ex. A (De-

position of Emery (Oct. 28, 2005)) at 127:5–24, 128:16–22, 130:21 to 133:10. By contrast, Section 3.3.1 of the E–Passport Evaluation Plan directs GPO, the State Department, and NIST to document their "test results and report them to the E[lectronic] P[assport] P[rogram] M[anagement] O[ffice] in a format shown in Appendix C." AR 289, 359–72 (E–Passport Evaluation Plan § 3.3.1, App. C). That format was used in the Test Reporting Charts contained in the Administrative Record.

213 (E-mail from Michael C. Emery, Director of the Passport and Postcard Section, GPO, to Richard A. Grasso, Chief Technology Evaluation Officer, GPO (Apr. 27, 2005)). After delivering OTI's products to the State Department to determine their compatibility with the printers, this error grew to be serious. AR 212 (E-mail from Keith Bruce, State Department, to various individuals (Apr. 27, 2005)). Two of OTI's book covers were tested in the printers, *id.*, before all of them were returned to GPO for further evaluation and observation relating to the adhesive failure. AR 222 (E-mail from Richard P. McClevey, Director of Facilities Management with the Passport Services Directorate, State Department, to Barbara A. Albin, State Department (Apr. 28, 2005)).

Thereafter, OTI learned that its supplier of adhesive blend had received an incorrect ingredient from the adhesive manufacturer's distributor. AR 228 (Letter from Stephen Luft, Director of Special Projects, Applied Optical Technologies, to Bashan (May 12, 2005)). Soon after, Mr. Bashan initiated a meeting with Mr. Emery and informed him of the error. Def.'s Reply Ex. A (Deposition of Emery (Oct. 17, 2005)) at 8:21 to 9:23. In addition, Mr. Bashan presented Mr. Emery with a letter from Mr. Luft and new prototype passport book covers that no longer incorporated the improper adhesive. *Id.* at 10:23 to 12:18. Mr. Emery refused to accept the replacement covers. *Id.* at 9:13 to 10:3, 12:15 to 13:6, 15:4–12. Mr. Bashan subsequently mailed both the letter and samples to Mr. Emery; however, these samples have never been tested by GPO. *Id.* at 65:9–23, 68:1–16.

On May 18, 2005, Ms. Broadnax informed OTI that GPO no longer "contemplate[d] any further orders ... for the OTI product for use in ... any future phases of the E[lectronic] P[assport] 2004 contract, as a result of [the] product's current and previous deficiencies." AR 226 (Letter from Broadnax to Bashan (May 18, 2005)). Specifically, the letter noted that OTI had failed to satisfy the contract's requirements for a second time. *Id.*

On November 7, 2005, the government informed the court that it intended to exercise CLIN 5, or stage three, of the Solicitation with respect to [* * * *]. Letter from Richard B. Evans, Trial Attorney, DOJ, to William M. Weisberg, Sullivan & Worcester LLP (Nov. 4, 2005); Tr. 145:25 to 146:5 (Test. of Frank E. Moss, Deputy Assistant Secretary of State, Bureau of Consular Affairs, Passport Services); Tr. 201:9–11 (notice from counsel for the government of GPO's intent to exercise CLIN 5). At trial, Deputy Assistant Secretary Moss testified that the government intended to conduct the pilot program [* * * *], even though covers from other contractors could continue to be tested in, and possibly pass, stage two. Tr. 166:9 to 170:3, 171:24 to 173:18 (Test. of Moss).

OTI filed a protest with GAO concerning the termination of their contract by GPO. *Matter of OTI America, Inc.*, B–295455.3, 2005 CPD P 157, 2005 WL 1994254 (GAO Aug. 10, 2005). GAO subsequently denied OTI's protest concluding that OTI "was not treated unfairly." *Id.*, at *5. Thereafter, OTI filed a redacted complaint in this court on August 17, 2005. The government filed a motion to dismiss, and in accord with 28 U.S.C. § 1491(b)(3), the court adopted an expedited schedule for briefing that motion.[11] This court subsequently denied the government's motion to dismiss, holding that it had subject-matter jurisdiction to consider OTI's claim. *OTI I*, 68 Fed.Cl. 108. The court then adopted an accelerated schedule for submitting the administrative record, conducting limited discovery, and briefing cross-motions for judgment on the record.[12] An

---

11. Regarding discovery, OTI filed a motion to conduct limited discovery that was considered along with the government's motion to dismiss. That motion was denied without prejudice because the administrative record had not yet been filed and the motion could not be tested against the record. *See OTI*, 68 Fed.Cl. at 117–18. After the administrative record was filed, OTI submitted a Renewed Motion for Leave of Court to Conduct Expedited Limited Discovery. The court granted this motion in part, permitting OTI to depose, within a limited scope and for a limited time, GPO's Contracting Officer for the Solicitation, Albertha M. Broadnax, and the Director of GPO's Passport and Postcard Section, Michael C. Emery. Order of Oct. 13, 2005.

12. 28 U.S.C. § 1491(b)(3) provides that "[i]n exercising jurisdiction under this subsection, the

argument on the cross-motions and a brief trial of facts bearing on equitable issues was held on November 7, 2005. The case is now ready for disposition.

## ANALYSIS

This court has bid-protest jurisdiction to consider OTI's claim that GPO's termination of its contract was improper. *See OTI I*, 68 Fed.Cl. at 115. OTI has established that it is an "interested party" in the procurement, 28 U.S.C. § 1491(b)(1), and that it has standing to pursue this protest. *See Asia Pac. Airlines v. United States*, 68 Fed.Cl. 8, 17–18 (2005) (citing *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351–52 (Fed.Cir. 2004)).

OTI puts forward three separate grounds to support relief. First, it contends that the government violated applicable procurement precepts by failing to disclose the evaluation criteria that it used to assess OTI's sample book covers. Pl.'s Mot. at 10. Specifically, OTI argues that the government had put in place but had not published a Selection Guidance to evaluate the products supplied by contractors and that it applied Rule 2 of that Guidance when it eliminated OTI from consideration for full agency deployment. *Id.* at 11–12; *see* AR 239 (E–Passport Selection Guidance) ("Selection Guidance"), 288 (E–Passport Vendor Product (Stage II) Test & Evaluation Plan Draft version 0.91a § 3.2.2 (Mar. 11, 2005)) ("E–Passport Evaluation Plan"). The government counters that the Selection Guidance was merely "an internal set of guidelines," not evaluation criteria, and that its existence did not alter the minimum requirements outlined in the Solicitation. Defendant's Response to Plaintiff's Motion for Judgment Upon the Administrative Record ("Def.'s Response") at 6. Furthermore, the government contends that the guidance was in effect disclosed to OTI in the cure notice sent by Ms. Broadnax. Def.'s Response at 9; *see* AR 210 (Letter from Broadnax to Bashan (Mar. 16, 2005)).

Second, OTI claims that the Selection Guidance was applied arbitrarily and unrea-

sonably by GPO, in that other contractors were given "multiple chances to correct much more serious problems" than those found with OTI's products. Pl.'s Mot. at 15–16. In addition, OTI asserts that the administrative record shows "internal inconsistencies" regarding the testing phase in which OTI's products failed with respect to the adhesive error. *Id.* at 21–22. (The testing phase affects application of Rule 2 of the Selection Guidance, as later discussed.) The government responds that OTI was treated properly and in the same fashion as every other contractor whose products failed in a comparable manner. Def.'s Response at 10. The government also states that OTI is incorrect in its allegation that the adhesive failure may have occurred in a testing phase different than OTI's initial failure. Def.'s Response at 15–17.

Third, OTI avers that the Contracting Officer, Ms. Broadnax, did not apply her own judgment in terminating OTI and that she simply followed the recommendations of her technical experts when she was obliged to exercise her own discretion. Pl.'s Mot. at 23–24. The government defends Ms. Broadnax and her actions, arguing that while she did take into consideration the advice of GPO and State Department officials, the ultimate decision to eliminate OTI was based on her own independent judgment. Def.'s Response at 17–18.

In the analysis that follows, the court addresses whether GPO's action respecting OTI was improper and whether OTI suffered any prejudice. A concluding section discusses equitable issues affecting relief.

### A. Standards for Decision

The Administrative Procedure Act, 5 U.S.C. § 706, sets forth the standards this court is to use to review an agency's decision regarding a contractual solicitation or award. *See* 28 U.S.C. § 1491(b)(4). Section 706 of Title 5 directs a reviewing court to set aside an agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

courts shall give due regard to the interests of national defense and national security and the

need for expeditious resolution of the action."

§ 706(2)(A); *see PGBA, LLC v. United States,* 389 F.3d 1219, 1225–26 (Fed.Cir.2004) (holding that 28 U.S.C. § 1491(b)(4) incorporates *only* the standard of decision from 5 U.S.C. § 706, and does not eliminate the court's discretion as to whether injunctive relief is appropriate). This court should overturn the agency's action if the plaintiff shows by a preponderance of the evidence that "the procurement official's decision lacked a rational basis ... [or] the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) ("*Impresa Construzioni II*") (citing *Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir. 1973)); *see also Gentex Corp. v. United States,* 58 Fed.Cl. 634, 648 (2003). In the court's evaluation of the agency action, "the court 'is not empowered to substitute its judgment for that of the agency' " but rather "must look to the see whether the agency considered the relevant factors and made a rational determination." *Keeton Corrs., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)).

In determining whether an official lacked a rational basis in making a procurement decision, the court must evaluate whether " 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' " with the burden of proof resting on the plaintiff. *Impresa Construzioni II,* 238 F.3d at 1333–34 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994)). An agency's decision can lack a rational basis where it " 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Keeton Corrs.,* 59 Fed.Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

To prevail under a theory that a government agency acted without rational basis, the plaintiff must also show that the error on the part of the government prejudiced the plaintiff in the procurement process. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005); *PGBA, LLC v. United States,* 60 Fed.Cl. 196, 203 (2004) (citing *Advanced Data Concepts,* 216 F.3d at 1057), *aff'd,* 389 F.3d 1219 (Fed.Cir.2004). This requirement has also been described as necessitating a showing by the plaintiff that "there is a substantial chance that it would have received the award but for the faulty evaluation." *TLT Constr. Corp. v. United States,* 50 Fed.Cl. 212, 216 (2001) (citing *Statistica v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)).

**B.  GPO's Actions in the Procurement**

**1.  *The selection criteria.***

GPO developed so-called "Selection Guidance," AR 238–40 (Selection Guidance), or "Evaluation Rules," AR 288–89 (E–Passport Evaluation Plan § 3.2.2), for its Electronic Passport Program to provide rules under which "[t]echnical performance testing and evaluation [under Stage 2] will be conducted." *Id.*[13] These rules were never published to any of the contractors. Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 27:23 to 28:14; Def.'s Reply at 3.[14]

---

**13.** The rules are set out in two places, in the E–Passport Selection Guidance, AR 238–40, and in Section 3.2.2 of the E–Passport Vendor Product (Stage II) Test & Evaluation Plan. GPO developed the rules and applied them during the procurement process. Def.'s Mot. at 19; Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 26:22 to 31:6; *see* Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 79:20 to 81:8.

**14.** It appears that the Rules were not yet in existence at the time of the Solicitation, but instead were developed after the contracts had already been awarded and the testing scheme had commenced. *See* AR 462–63 (Various e-mails between L. Travis Farris, State Department, McClevey, Broadnax, and Emery (Feb. 28, 2005)) (discussing the drafting of cure notices, and whether ASK's failure on its first test run warranted a cure notice or deficiency letter); *see also* AR 279–373 (E–Passport Evaluation Plan) (in draft form as of March 11, 2005). Moreover, the Evaluation Rules were still in draft form when OTI suffered its original failures [* * * *]. *Compare* AR 210–11 (Letter from Broadnax to

According to GPO's Contracting Officer, Ms. Broadnax, and the Director of GPO's Passport and Postcard Section, Mr. Emery, the aforementioned rules "set forth criteria for when a contractor may be eliminated from the competition." Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 80:18–21; see Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 31:4–6 (indicating that once a contractor's product was in testing, Ms. Broadnax solely relied on the rules). In particular, Rule 2 states that a "product *may* be eliminated if: (a) [i]t fails more than once in a single Test Phase[,] (b) [i]t fails in a previously passed Test Phase during a retest cycle[,] (c) [i]t is issued more than two cure notices[, or] (d) [i]t cannot successfully complete testing prior to the start of the Stage III Pilot Test." AR 288 (E–Passport Evaluation Plan § 3.2.2) (emphasis added). The rules are not internally consistent. In direct contrast to Rule 2(b), Rule 4 of the Evaluation Rules provides that a product that *fails a previously passed phase "will* result in elimination of the product from further consideration." AR 288–89 (E–Passport Evaluation Plan § 3.2.2) (emphasis added).[15] Also, Rule 4 states that "[a]

product will pass to the next Text Phase if the product is in significant compliance," but there is no evidence within the Administrative Record as to the meaning of "significant compliance" as employed in Rule 4. *See id.* Rule 3 of the Evaluation Rules also has a bearing on this case, providing that if a contractor "succeeds in fixing the [first] problem and a new performance problem is identified in a subsequent Test Phase then the [contractor] will be issued a cure notice for that new performance problem." AR 288 (E–Passport Evaluation Plan § 3.2.2). Under Rule 3, a contractor could fail a phase once, receive a cure notice, submit a corrected product, pass the previously-failed phase, and then fail a subsequent phase, resulting in another cure notice being issued. *Id.*[16] Thus, under Rule 3, up to five total cure notices could be issued to a single contractor, one for a single failure after each individual phase. Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 117:2–5.

■ OTI avers that GPO relied on these undisclosed evaluation criteria when it tested and evaluated the proposals submitted by contractors and that such reliance was a

---

Bashan (Mar. 16, 2005)); AR 236 (Results from OTI first test run (Feb. 17–18, 2005)), *with* AR 279–373 (Draft E–Passport Evaluation Plan, version 0.91a (Mar. 11, 2005)). Regardless of when the Evaluation Rules were finally adopted, GPO was under an obligation to inform all offerors still participating in the competition of their adoption and implementation. *Cf.* 48 C.F.R. § 15.206(a), (b) (2005) (FAR provision regarding amendment of a solicitation).

15. The pertinent part of Rule 4 states in full:
A product will pass to the next Test Phase if the product is in significant compliance, at the current phase of testing, and if the condition of the product at that phase can be tested at the next phase. Testing will proceed as follows:
  . . .
  Phase 3: A product that fails testing at Phase 3 may be adjusted and resubmitted for testing one time to correct the failure at that Phase. This would require that the product be returned to Phase 1. An adjusted and resubmitted product that passes Phases 1 and 2 testing will be allowed to be resubmitted for Phase 3 testing. A failure in the repeated test phase will result in elimination of the product from further consideration at that point.
  Phase 4: A product that fails testing at Phase 4 may repeat the test one time. This would require that the product be returned to

Phase 1. An adjusted and resubmitted product that passes Phases 1, 2 and 3 testing will be allowed to be resubmitted for Phase 4 testing. A second failure of an offered product at Phase 4 will result in elimination of the product from further consideration.
AR 288–89 (E–Passport Evaluation Plan § 3.2.2).

16. Rule 3 provides:
A failed test shall be defined to the vendor in a cure notice and allow the vendor up to 10 working days from the time the vendor receives the notice to provide an adjusted product for retesting. If the vendor fails to provide an adjusted product for testing within 10 working days, it will be eliminated from further consideration. If a vendor wishes to provide an adjusted product for re-testing, it must inform the GPO Contracts Officer within 5 working days of receipt of the notice. *If the vendor succeeds in fixing the problem and a new performance problem is identified in a subsequent Test Phase, then the vendor will be issued a cure notice for that new performance problem with 10 working days to provide an adjusted product.* Resubmitted products will be reentered into the testing queue in the order they are received.
AR 288 (E–Passport Evaluation Plan § 3.2.2) (emphasis added).

material default on GPO's part. Pl.'s Mot. at 10. This claim has potential merit. "It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.... [T]he government may not rely upon undisclosed evaluation criteria in evaluating proposals." *Banknote Corp. of Am. v. United States,* 56 Fed.Cl. 377, 386 (2003), *aff'd,* 365 F.3d 1345 (Fed.Cir.2004); *see Gentex,* 58 Fed.Cl. at 652.[17] In *Gentex,* where the plaintiff responded to a solicitation for aircrew masks, the court found a "lack of clarity" in the solicitation, as the government did not properly identify which of the stated requirements were mandatory. 58 Fed.Cl. at 652. Ultimately, the court held that " 'making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition,' " and because the "rules of the game were muddied," the procurement was rendered unfair. *Id.* (quoting *Dubinsky v. United States,* 43 Fed. Cl. 243, 259 (1999)); *see also PGBA,* 60 Fed. Cl. at 207 (lack of clarity in solicitation resulted in uneven treatment which "goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process[es]"); *Asia Pac. Airlines,* 68 Fed.Cl. at 20–22 (solicitation and commentary at pre-proposal bidders' conference were ambiguous as to whether schedule for mail flights among Hawaiian Islands was mandatory).

This case is not the traditional pre- or post-award bid protest, as the competition for the full and final procurement of electronic passport book covers "consists of a framework built around stages of issued contracts rather than upon offers." *OTI I,* 68 Fed.Cl. at 117. Here, the Evaluation Rules do not apply to the award of a contract between multiple bidders but rather to the selection of one or multiple contractors for the ultimate award of full agency deployment. The principles pertinent to evaluation criteria in procurements nonetheless govern this case. The court must determine whether GPO's rules were "evaluation criteria," whether they were disclosed to the contractors vying for the exercise of full agency deployment, and whether their undisclosed existence prejudiced OTI. *See* AR 9, 288 (Solicitation § B3, E–Passport Evaluation Plan § 3.2.2).

The government asserts that the Evaluation Rules do not change the requirements of the Solicitation and should be considered as merely internal guidelines for evaluation. Def.'s Response at 6. In support, the government cites a pair of decisions by the General Accounting Office, now the Government Accountability Office, one of which found a checklist to be a guideline and not a rule. *See Matter of Lexis–Nexis,* B–260023, 95–2 CPD P 14, 1995 WL 341842 (GAO May 22, 1995) (finding evaluation checklists to be internal guidelines, and not undisclosed evaluation criteria, for a solicitation subfactor that encouraged offerors to offer additional or enhanced services above and beyond the solicitation's requirements). In the other cited decision, however, GAO concluded that a point system was used in a binding fashion and thus had to be applied as a rule even though such point systems usually were not controlling. *See Matter of Telos Field Eng'g,* B–253492, B–253492.6, 94–2 CPD P 240, 1994 WL 707206 (GAO Dec. 15, 1994) (use of a point system found to be determinative and thus binding in the instance at hand, although point systems typically are not binding because they are used only as guidance, not rules).

Here, contrary to the government's contention, the Evaluation Rules appear to have been applied by GPO in a binding manner against OTI in determining whether it should be eliminated from consideration of future

---

**17.** GPO is an agency of the legislative branch. *See OTI I,* 68 Fed.Cl. at 109 n. 2 (citing *Tatelbaum v. United States,* 749 F.2d 729, 730 (Fed.Cir. 1984), and *Fry Communications, Inc. v. United States,* 22 Cl.Ct. 497, 502–03 (1991)). Nonetheless, the statutes and regulations pertinent to procurement by executive branch agencies can be persuasive guides to the fundamental standards that should govern GPO's procurement actions. Statutes require federal agencies to identify the evaluation factors for competing vendors and to specify the relative importance of the factors in the particular procurement. *See, e.g.,* 10 U.S.C. § 2305(a)(2)(A), (a)(3)(A) (applicable to the Department of Defense). Similarly, the Federal Acquisition Regulations ("FAR") require that "[a]ll factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation." 48 C.F.R. § 15.304(d).

stages. Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 37:13 to 38:8; Def.'s Reply Ex. A (Deposition of Emery (Oct. 17, 2005)) at 48:12–18, 59:1–8 (describing the Evaluation Rules as "hard and fast rules"). Furthermore, Ms. Broadnax responded that the rules were the "sole[ ]" criteria governing the pass-fail testing of sample products. Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 31:4–6.

The Evaluation Rules were neither set out in the Solicitation nor separately provided to the parties. Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 28:12 to 29:10, 35:17 to 36:7; see Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 80:22 to 81:8. The government counters that even though the Rules were not disclosed to the contractors in the Solicitation, Def.'s Reply at 3, the cure notice sent to OTI was sufficient to convey the necessary information about the Rules. Def.'s Response at 9; see AR 210 (Letter from Broadnax to Bashan). However, Ms. Broadnax's statements in the cure notice do not communicate the full import of the Evaluation Rules, nor do the Statements convey the tenor of the inconsistencies in the Rules. For example, Rule 2 provides that a product may be eliminated if it fails more than once in a single phase, and Rule 4 states that a contractor's product that fails a previously passed phase will be eliminated, except where the product is in "significant compliance," while Rule 3 provides that a contractor which succeeds in fixing a problem only to have a different problem emerge in a subsequent phase will be given a further cure notice and opportunity to correct the error. AR 288–89 (E–Passport Evaluation Plan § 3.2.2). The cure notice OTI received stated merely that OTI would be eliminated if its corrected product "fails to pass testing a second time" without reference to any condition about phases or significant compliance. Compare AR 210 (Letter from Broadnax to Bashan) with Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 115:16 to 120:15 (stating that a contractor that has a second overall failure during stage two testing but its first in a particular phase will not be eliminated from the competition). Consequently, the cure notice was insufficient to provide notice to OTI of the existence and application of the Evaluation Rules.

That GPO applied its Rules as evaluation criteria without prior notice to the competing contractors does not, by itself, show the existence of an error that was material to the procurement and that operated to the prejudice of OTI. GPO's action in establishing evaluative rules but not disclosing them is analytically akin to a violation of a statute or regulation. In that setting the Federal Circuit has emphasized that

> [w]e have never said ... that violation of a statute or regulation constitutes a per se breach of the government's duty to treat all bidders fairly and honestly. Rather, the rule is that a "proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery."

*Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1134 (Fed.Cir.1998) (quoting *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1204 (1974)). As a consequence, the merits of OTI's other grounds for relief must be evaluated.

### 2. *Arbitrary application of evaluation rules.*

A "fundamental principle of government procurement is that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." *TLT Constr.,* 50 Fed Cl. at 216; *accord Gentex,* 58 Fed.Cl. at 653. OTI asserts that the government applied the Evaluation Rules in an arbitrary and capricious manner. Pl.'s Mot. at 14–16. The government counters that all contractors, including OTI, whose products failed testing for the second time in the same phase during stage two were eliminated from further consideration. Def.'s Response at 10 (citing AR 237, 508 (Testing Matrix)). In putting forward this argument, however, the government relies on the results described in the Testing Matrix, AR 237, 508; see Def.'s Response at 10, 12; Def.'s Reply at 7, 13, the importance, accuracy, and reliability of which Mr. Emery, the Director of GPO's Passport and Postcard Section, has rejected. Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 128:8–15, 134:18–22, 135:9–12 (stating that

GPO did not rely on the Testing Matrix which was created by a State Department contractor and that it was "not accurate" and "completely out of whack"); *see also* Hr'g Tr. 32:13–23 (Oct. 12, 2005) (government counsel's identification of a particular error within the Testing Matrix concerning OTI).

The Administrative Record shows multiple instances in which a straightforward application of the Evaluation Rules should have resulted in issuance either of a cure letter or of a termination letter, but did not for undisclosed reasons. For example, [* * * *].

During the additional testing [* * * *] subsequent to these tests.

In sum, it is possible to extrapolate from the limited evidence provided in the Administrative Record that [* * * *].[18]

Another [* * * *]. AR 477 (E-mail from McClevey to Broadnax (Mar. 3, 2005)). Pursuant to Rule 4 of the Evaluation Rules, if a product failed at any phase, the contractor could resubmit a corrected product that would be returned to the first phase to begin the entire testing regime anew. AR 288–89 (E–Passport Evaluation Plan § 3.2.2); *see* Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 116:4–10. [* * * *] received a cure notice in mid-March 2005 [* * * *]. Notably, Mr. Emery stated in his deposition that there was not "a hard-and-fast rule" as to "what level of [* * * *] failure would cause [him] to be concerned." Def.'s Reply (Deposition of Emery (Oct. 28, 2005)) at 90:6–10.

Overall, the record shows that during the testing stages of the procurement, GPO applied the Evaluation Rules inconsistently to products supplied by multiple contractors including OTI. This court is acutely aware that it may not replace its judgment for that of the agency. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 557–58, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Keeton Corrs.*, 59 Fed.Cl. at 755 (citing *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814). However, the administrative record demonstrates that GPO did not apply its evaluative criteria in an even-handed and fair way. The record provides an inadequate explanation as to the rationale underlying GPO's termination of OTI while keeping other contractors in the competition despite repeated and ostensibly comparable test failures with their products.

### 3. *Abuse of discretion.*

Throughout the procurement process, "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them.'" *Impresa Construzioni II*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). A court must "determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" with the protesting party bearing the burden to show that the decision by the agency had no rational basis. *Impresa Construzioni II*, 238 F.3d at 1332–33 (quoting *Saratoga Dev. Corp.*, 21 F.3d at 456).

OTI avers that the Contracting Officer, Ms. Broadnax, did not act with independent judgment to apply the Evaluation Rules evenly and rationally. Pl.'s Mot. at 23–24. In particular, OTI claims that Ms. Broadnax simply "followed the . . . findings of other individuals involved in the procurement." *Id.* at 24. The government responds that Ms. Broadnax's decision to eliminate OTI from the competition was independently made subsequent to her receipt of advice from the technical evaluation team and review of their testing results. Def.'s Response at 18.[19]

■ A contracting officer should exercise her discretion independently and in an informed manner. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed.Cl. 421, 427 (2002) ("*Impresa Construzioni III*"), *on remand from Impresa Construzioni II*, 238 F.3d 1324; *cf.* 48 C.F.R.

---

18. By contrast, the [* * * *]. AR 477 (E-mail from McClevey to Broadnax).

19. The technical evaluation team included Michael C. Emery, Director of the Passport and Postcard Section for GPO, Richard A. Grasso, Chief Technical Review Officer for GPO, and Richard P. McClevey, Bruce H. Kirkham, Travis L. Farris, and Keith C. Bruce, from the State Department. Def.'s Reply Ex. A (Deposition of Emery (Oct. 17, 2005)) at 23:15–18.

§ 15.308 (2005) (the decision of the contracting officer "shall represent [her] independent judgment."). In reviewing the contracting officer's decision, the "standard of reasonableness . . . is not subjective, but objective." *Impresa Construzioni III,* 52 Fed.Cl. at 428 (citing *Tidewater Mgmt. Serv., Inc. v. United States,* 216 Ct.Cl. 69, 573 F.2d 65, 74 (1978)). It is evident from the administrative record and Ms. Broadnax's deposition that she did not exercise her discretion, but rather she applied the determinations and conclusions reached by her technical evaluation team. *See, e.g.,* Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 39:14 to 40:6 (In responding as to whether she personally weighed the difference between an [* * * *] failure and [* * * *] failures, Ms. Broadnax stated that she did not and "relied on the technical team because they're the experts."). Ms. Broadnax relied heavily on her technical evaluation team on most matters, including issuance of the cure notice to OTI, *id.* at 12:12 to 14:13, and ultimately the termination of OTI from the competition. *Id.* at 40:15 to 41:10. Furthermore, she "solely relied" on the information she received from others in deciding that the adhesive failure by OTI was a "failure under the procurement." *Id.* at 17:6 to 18:4.

■ That Ms. Broadnax heavily relied on others in reaching decisions does not itself constitute error, let alone prejudicial error. However, it appears that Ms. Broadnax was less than sufficiently cognizant of the discretion she possessed under the Evaluation Rules to determine whether or not a contractor's product should be eliminated if under Rule 2 it failed more than once in a single test phase. Although she had approved the Rules, Pl.'s Mot. Ex. A (Deposition of Broadnax (Oct. 17, 2005)) at 29:14–15, she responded to a question about whether a clerical error could be cause for elimination under Rule 2, by stating that she had "no idea." *Id.* at 42:9–23. In this case, a reasoned exercise on the part of the contracting officer was critical to OTI's posture. OTI's second failure was unrelated to the defects in its

sample product that engendered the cure notice. The cure notice concerned [* * * *], while the second failure arose with [* * * *]. *See supra,* at 650–51. The Contracting Officer had discretion under Rule 2 of the Evaluation Rules to allow OTI to correct the defect and proceed, [* * * *], *see supra,* at 657–58, but there is no indication in the record that she endeavored to exercise the discretion that she had available.[20] In the circumstances, the court concludes that GPO's implementation of the Evaluation Rules was arbitrary in that GPO disparately treated competing contractors and also constituted an abuse of discretion insofar as OTI was concerned in that GPO's contracting officer did not apply the discretion she possessed under the Evaluation Rules.

### C. Prejudice to OTI

■ Having found that GPO's actions in eliminating OTI from the competition for full agency deployment of electronic passport book covers was arbitrary and an abuse of discretion, the court must now determine whether such action prejudiced OTI in the procurement process. *See Bannum,* 404 F.3d at 1351; *Gentex,* 58 Fed.Cl. at 653–54 (plaintiff must establish "that there was a substantial chance it would have received the contract award") (citing *Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003)).

The record shows that OTI was a strong competitor prior to its elimination. *See* AR 232 (E-mail from Emery to McClevey and Grasso (May 20, 2005)) (noting that "to date" OTI had the "best results of thru-put, of product in the UNO lines"); AR 235 (Results from OTI 2nd test run (Apr. 18–25, 2005)) ( [* * * *] ).

With these results and only [* * * *], *see* Tr. 166:9 to 167:7 (Test. of Moss), OTI would "have been in the zone of active consideration and had a reasonable likelihood of securing the award" had it not been improperly eliminated. *Gentex,* 58 Fed.Cl. at 654 (citing *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999); *Data Gen.*

---

**20.** By contrast, [* * * *]. There was no definitive rule that governed what level of [* * * *] failure was necessary for a cure notice or termination letter. *See* Def.'s Reply Ex. A (Deposition of Emery (Oct. 28, 2005)) at 90:6–10.

*Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996)). Therefore, OTI has shown that it was prejudiced as a result of GPO's action to eliminate it from the competition without a rational basis.

GPO materially erred in the procurement, and because OTI suffered prejudice as a result of those errors, OTI's protest is sustained.

### D. Equitable Relief

OTI requests that this court grant it injunctive relief by enjoining GPO from proceeding with evaluations that would lead to the award of full agency deployment. OTI specifically requests that this court bar GPO from placing an order for "any production portion of the contract to any entity unless and until OTI is permitted to participate" in the procurement. Pl.'s Mot. at 29. For OTI to obtain any permanent injunction, it must show: (1) success on the merits of the case; (2) that it will suffer irreparable harm if injunctive relief is not granted; (3) that the balance of hardships of the parties favors injunctive relief; and (4) that such relief is in the public interest. *See PGBA,* 389 F.3d at 1228–29 (citing *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

In its prior orders issued in this case, the court has explicitly refused to hinder, prevent, or bar GPO and the State Department from proceeding with the procurement either through testing of prototype products or through ordering electronic passport covers for use in a pilot study or in a full-production mode. *See* Hr'g Tr. 59:4 to 60:6 (Aug. 22, 2005) (denying OTI's motion for a temporary restraining order); Hr'g Tr. 18:1–8 (Oct. 24, 2005) (emphasizing that no stay or temporary relief had been issued in the case); Tr. 187:6–11 (stating that the court has interposed no impediment to GPO's exercise of CLIN 5, relating to production of electronic passport covers for use in pilot programs). Strong national defense and security interests are present in this case. *See* 28 U.S.C. § 1491(b)(3) (quoted in pertinent part *supra,* at 651 n. 11). Security of the nation's borders has emerged since September 2001 as a major concern, and the use of electronic passports has been chosen as one means of preventing unwanted foreign nationals from entering this country. Nonetheless, while this national security interest may affect the type of injunctive relief the court may grant, it does not necessarily forestall the issuance of any and all forms of such relief.

Because OTI has succeeded on the merits of its protest, OTI has passed over a major hurdle on the way to equitable relief. OTI further argues that it will face irreparable harm if it is not provided the opportunity of being reinserted into stage two of the testing regime. OTI cites its potential loss in revenues, the lost opportunity to compete for full agency deployment and recoup the expenses it has incurred in developing its product, and [* * * *]. Tr. 89:9–23, 90:5–12, 102:3–22 (Test. of Ohad Bashan, President, OTI). When "assessing irreparable injury, the relevant inquiry in weighing this factor is whether the plaintiff has an adequate remedy in the absence of an injunction." *PGBA,* 60 Fed.Cl. at 221 (quoting *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 743 (2000)) (internal quotation marks removed). In this case, Mr. Bashan testified that "[* * * *]." Tr. 89:9–23 (Test. of Bashan). A loss of potential profits "stemming from a lost opportunity to compete on a level playing field has ... been found sufficient to constitute irreparable harm." *Gentex,* 58 Fed.Cl. at 654 (citing *United Payors & United Providers Health Srvs., Inc. v. United States,* 55 Fed.Cl. 323, 333 (2003)). Moreover, [* * * *]. Tr. 102:3–6 (Test. of Bashan); *see also* Tr. 81:6–86:18, 102:2–22 (Test. of Bashan). The court credits Mr. Bashan's testimony. In light of this evidence, the court finds that OTI has sufficiently established that it would suffer irreparable harm without injunctive relief and that no adequate alternative remedy exists. An award of bid preparation costs would not, by itself, be sufficient to redress the injury to OTI. Therefore, the factor of irreparable harm weighs in favor of the plaintiff.

In balancing the hardships between OTI and the government, the court must weigh the potential harm to the plaintiff if injunctive relief is not awarded against the potential harm to the government and other contractors if such relief is granted. Against

the factors that favor OTI, the government asks the court to consider the "potential for delay and disruption" of the electronic passport competition and national security interests that apply to the security of this nation's borders. Def.'s Response at 19–20. "Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (quoting *Hecht v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)). Further, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. 1798 (citing *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941)).

There is no question that the government would be harmed severely if the court were to enjoin it from pursuing its previously-announced plan to exercise CLIN 5, to order electronic covers for a pilot program [* * * *]. Such an injunction would delay the institution of the electronic passport program and prevent the government from meeting the October 2006 timeline to have such a program in place. *See* Tr. 144:6–14, 146:6–25 (Test. of Moss). Thus, the court will not impose any impediment to proceeding with the pilot program. Tr. 186:16 to 187:11, 200:18–25, 201:16–18. The court accordingly denies OTI's principal request for injunctive relief; *i.e.,* it will not bar the government from proceeding with the pilot program until OTI has an opportunity to qualify its product.

Nonetheless, the court finds that the government will not face such a serious a hardship if OTI were to be permitted to reenter the competition at a testing stage while the products of one or more competing contractors advanced to pilot-stage production and GPO and the State Department proceeded with the pilot program. This procurement is designed to allow for the testing and evaluation of multiple contractors' products at different stages of the competition. *See* Tr.

168:23 to 170:21 (Test. of Moss) ( [* * * *] ). In addition, Deputy Assistant Secretary Moss testified that there will only be one such pilot test. Tr. 174:7–18 (Test. of Moss). Moreover, he stated that [* * * *]. *Id.* Consequently, despite the fact that it would take at least eight-to-ten weeks for GPO and the State Department to receive OTI's products and proceed, potentially, through the entire testing regime of stage two, Tr. 144:15–21, 152:16–22, 153:20 to 154:4 (Test. of Moss), the government would not face undue hardship in testing a product from OTI as a restored competitor, as it is prepared to handle multiple evaluations concurrently and could continue with both the pilot program and stage two testing on other contractors' products.

The final factor in the court's analysis is whether granting the plaintiff's prayer for relief would serve the public interest. Throughout this case, the court has been cognizant of the national security interest that pervades every aspect of the procurement of new U.S. electronic passports. *See* 28 U.S.C. § 1491(b)(3). Admittedly, " 'claims of national security ... are often advanced by the [g]overnment in challenges to procurement decisions. The [c]ourt will not blindly accede to such claims but is bound to give them the most careful consideration.' " *Gentex,* 58 Fed.Cl. at 655 (quoting *Harris Corp. v. United States,* 628 F.Supp. 813, 822 n. 13 (D.D.C.1986)). "[A]llegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public." *Gentex,* 58 Fed.Cl. at 655 (citing *ATA Def. Indus., Inc. v. United States,* 38 Fed.Cl. 489, 506 (1997)). The public also has an important interest in ensuring that the ultimate selection of a contractor to produce electronic passport book covers is the result of a fair, rational, and deliberate process. *Doty v. United States,* 53 F.3d 1244, 1251 (Fed.Cir. 1995) (citing *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)). Any delay in the program would negatively affect the border security of the United States and [* * * *]. *See* Tr. 188:12–24 (Defendant's Summation); Tr. 134:14 to 135:25 (Test. of Moss); Def.'s Response 20–21. Apart from delaying an advance in bor-

der security, [* * * *]. Tr. 135:4–25 (Test. of Moss).

Previous cases in this court have denied injunctive relief, despite finding that an agency's actions in a procurement were improper, when the particular program had been established as urgent and critically important to the national security and defense of the United States. *Gentex*, 58 Fed.Cl. at 656–57 (denying injunctive relief "given the urgency of this procurement [for aircrew masks that provided protection in a chemical or biological attack] for the nation's military"); *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed.Cl. 502, 521–22 (2003) (rejecting injunctive relief for a procurement involving the construction of military housing for U.S. military personnel in Kuwait finding that national security concerns were "of paramount import"). Based upon Deputy Assistant Secretary Moss's testimony, however, this court finds that the reinsertion of OTI into the GPO's testing regime would not in any cognizable way delay or prevent the government from satisfying the pending timeline that extends to October 26, 2006.

Accordingly, in balancing the factors pertinent to injunctive relief, the court concludes that OTI is entitled to a limited injunction. GPO is ordered to reinstate OTI and to resume testing OTI's products at the same stage at which OTI was eliminated. In no other way is the government constrained from proceeding with its actions in the procurement at issue.

## CONCLUSION

For the reasons set forth above, OTI's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART. The government's motion for judgment on the administrative record similarly is GRANTED IN PART and DENIED IN PART. OTI is entitled to a limited form of equitable relief. GPO's termination of OTI's contract is set aside. GPO shall reinstate OTI and shall resume testing OTI's

products at the same stage in the competition at which those products were eliminated.[21]

Because this decision might contain "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, it is being issued under seal. The parties are requested to review the decision and to file proposed redactions on or before December 7, 2005.

IT IS SO ORDERED.

---

**21.** In accord with RCFC 65(a)(2), OTI's renewed motion for a preliminary injunction is subsumed within this action on OTI's request for a permanent injunction. OTI's emergency motion to strike defendant's reply brief and the affidavit of Frank E. Moss is DENIED as moot.