GTA CONTAINERS, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

J.G.B. Enterprises, Inc., Defendant–Intervenor.

No. 11–606C.

United States Court of Federal Claims.

Feb. 6, 2012.[1]

1. This opinion originally was filed under seal on January 26, 2012. The parties were requested to notify the court of any redactions. Plaintiff and defendant did not request any redactions. Intervenor's requested redactions would render some parts of the opinion meaningless. The court has adopted intervenor's redactions to the extent that they constitute identifying information. This published version also reflects corrected citation and typographical errors.

Scott E. Pickens, Washington, DC, for plaintiff. Karen A McGee, Barnes & Thornburg LLP, of counsel.

Michael S. Macko, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Elliot S. Avidan, U.S. Marine Corps, Quantico, VA, of counsel.

Joseph A. Camardo, Jr., Auburn, NY, for defendant-intervenor. Kevin M. Cox, Camardo Law Firm, P.C., of counsel.

## ORDER ON PERMANENT INJUNCTION AND ORDER FOR ENTRY OF JUDGMENT

MILLER, Judge.

This post-award bid protest is before the court after argument on the parties' cross-motions for judgment on the administrative record. The issues presented have been refined up to the last minute because the military twice since the inception of this suit has taken corrective action to delimit the scope of the contract under which it is placing an order for emergency procurement. The Government's evolved position is that the military canceled the solicitation and that the procurement vehicle is an emergency order to fill military exigencies without which troops would be imperiled and has nothing to do with the defunct contract. The protester insists that the awardee is in the position of filling an emergency order only because the military originally awarded the contract based on a material misrepresentation. The awardee-intervenor maintains that the protester lacks standing or would not be prejudiced by an award because the military questioned the protester's ability to perform the scope of work under the solicitation.

## FACTS

### I. *The Solicitation*

The factual recitation is drawn from the administrative record, as supplemented. This case concerns an attempted procurement of water and fuel systems by the Marine Corps Systems Command (the "MCSC" or the "Corps") in order to maintain the supplies—and combat readiness—of our Marine Expeditionary Forces. On February 18, 2011, the MCSC issued Solicitation M67854–11–R–5030 (the "Solicitation") seeking competitive proposals for the provision of Tactical Fuel Systems ("TFS") and Water Supply Support Equipment ("WSSE"), collectively referred to by the MCSC as Tactical Fuel and Water Systems ("TFWS"), and their individual component parts. AR 358. The MCSC sought to award a firm-fixed price requirements contract to span one base year and four option years with a $99 million ceiling. *Id.* The Solicitation informed potential offerors that the awardee would be responsible for procuring, packaging, and shipping specified water-and-fuel-storage systems and their component parts. AR 1622. The Solicitation was to be a 100 percent small-business set aside, and it incorporated the procedures for acquisition of commercial items located in Federal Acquisition Regulation ("FAR") Part 12, 48 C.F.R. Part 12 (2011). AR 358. The initial due date for proposal submissions was set as March 18, 2011—later extended to April 15, 2011. AR 358, 1342.

The administrative record discloses that the MCSC intended to make a single award based on overall "[b]est [v]alue" to the MCSC. AR 1293. In determining "best value," the Solicitation identified three factors that would be evaluated: (1) past performance, (2) technical capabilities, and (3) price. AR 367. The Solicitation instructed potential offerors to submit certain information regarding these three categories, *see* AR 365, 367–68, and informed those potential offerors that "Past Performance is more important than Technical and Price. Technical is more important than Price." AR 367. Offerors were also alerted that initial offers "should contain the offeror's best terms from a price and technical standpoint" because the "Government intend[ed] to evaluate offers and award a contract without discussion with offerors." AR 363.

Regarding past performance, the MCSC required offerors to provide past-performance information on "at least [two] programs underway or completed during the past [three] years as a prime or subcontractor and [two] programs underway or completed during the past [three] years by [their] subcontractors similar in content and scope to that proposed...." AR 365. The Solicitation also incorporated FAR 52.212–2, Evaluation—Commercial Items (Jan. 1999), which explained:

> The Government will evaluate how well the Offeror performed on previous *relevant* efforts of similar type (Tactical Fuel and Water Systems), size, and complexity. The standard is based upon the Offeror's ability to substantiate credible examples of past performance inclusive of delivery

schedule compliance, quality, and overall customer satisfaction. Other relevant information submitted by the offeror will be used to substantiate credible performance. AR 367.

Regarding the technical factor, the Solicitation informed offerors that "[t]he Government will evaluate the offeror's technical merit to assess its overall capability to fulfill the SOW ["Statement of Work"] requirements." AR 367. To this end offerors were instructed to include particular information. Offerors were first asked to describe "the size and composition of the team that will be assigned to manage this task ... [and to] describe individual qualifications and experience relevant to this task for each position." AR 365. Further, offerors were to describe "[a]ll teaming arrangements to include prime and subcontractors' roles ... [and to] [d]escribe the proposed work to be performed by you as the prime and by each individual subcontractor." *Id.* Offerors also were to provide, *inter alia,* a description of the warranty program and process that they intended to offer to the Government. AR 366.

Finally, for the pricing factor, offerors were instructed to complete a workbook of four Excel spreadsheets included with the Solicitation. AR 366. Each spreadsheet represented one of the contract line item number ("CLIN") under the Solicitation and was divided, as follows: CLIN 0001 referred to the water storage systems; CLIN 0002, to the components to support the water systems; CLIN 0003, to the fuel storage systems; and CLIN 0004, to the components to support the fuel systems. *See, e.g.,* AR 369–84; 391–93; 394–401; 403–06 (listing items in each of the respective CLINs). Each spreadsheet listed the specific items within that CLIN. *See id.* Offerors were to propose a price for each item in each CLIN, for each of the five encompassed fiscal years, and for each of the four quantity ranges (0–10, 11–50, 51–100, 101–500). AR 359, 366. Predicated on this information, the pricing information would then be evaluated, as follows:

Price information presented by the offeror will be evaluated for reasonableness. The Government will calculate an evaluated price for each Offeror's proposal by adding together all contract line item numbers (CLINs) against an evaluated quantity. The total evaluated price equates to the pricing of the CLINs presented in Attachment 5–TFWS Pricing. The evaluated price formula will be based on the total prices (Tps) in FY11–FY15 ...

(a) Price proposal for contract line item (CLIN) 0001 WSSE Systems List tab and CLIN 0003 TFS Systems List tab of Attachment 5, will be weighted 80% for purposes of total price evaluation.

(b) Price proposal for CLIN 0002 WSSE Components List tab and CLIN 0004 TFS Components List tab of Attachment 5–TFWS Pricing, will be weighted 20% for purposes of total price evaluation

(c) Total Evalued [*sic*] Price: CLIN 0001 TP*.80 + CLIN 0002 TP*.20 + CLIN 0003 TO*.80 + CLIN 0004 TP*.20

AR 367–68.

The proposal submission period closed on April 15, 2011. AR 1293. Seven offerors submitted proposals to the MCSC, including both plaintiff GTA Containers, Inc. ("plaintiff"), and defendant-intervenor J.G.B. Enterprises, Inc. ("intervenor").[2] AR 1343. In its proposal intervenor included the required past-performance information in section II. AR 1154. Intervenor indicated that "Tables 3 through 5 contain past performance data for JGB suppliers." *Id.* In Table 4 intervenor included past-performance data for [redacted], which indicated that [redacted] had served as a previous supplier to intervenor and as a previous supplier to the Defense Logistics Agency ("DLA") for components that were required by the Solicitation. AR 1158–59. Intervenor specifically stated that [redacted] past performance included delivery of a[redacted] and indicated that [redacted]. AR 1158. Moreover, when describing

---

2. All of the details concerning plaintiff's and intervenor's proposals need not be examined to adjudicate this dispute. Accordingly, the court will limit its discussion only to those facts regarding the proposals that are necessary to resolving the issues presented by plaintiff's protest.

the teaming arrangements it would use to satisfy the MCSC's needs, intervenor indicated that "JGB is the source for approximately [redacted] of the part numbers required by the TFS–LS/WSSE–LS program. The remaining are produced by a variety of Original Equipment Manufacturers ["OEMs"] with whom JGB has had long and successful relationships." [3] AR 1161. Intervenor also stated in its proposal that "[t]he JGB response to the solicitation is fully compliant to all requirements." AR 1153.

The MCSC evaluated the proposals from April 18, 2011, until June 13, 2011. AR 1293, 1342. In evaluating intervenor's proposal, the Technical Evaluation Team (the "TET") understood intervenor to be proposing [redacted] as a subcontractor supplier. See AR 1297–98. Regarding past performance—the most important factor in determining "[b]est [v]alue"—the TET assigned intervenor [redacted] rating and explained in its rationale that "relevant subcontractor past performance submissions [had been] submitted substantiating credible TFS/WSSE experience." AR 1297. Further, the TET assigned intervenor [redacted] technical rating and noted specifically: "[t]eaming arrangements with: [redacted]. Proposed work by prime and subcontractors adequately addressed." [4] AR 1298. On July 6, 2011, the MCSC awarded Contract M67854–11–D–5030 ("the Contract") to intervenor. AR 1376. Concurrent with the award of the Contract, the MCSC issued Delivery Order 0001 in the amount of $42,521,776.00; and on the following day, it issued Delivery Order 0002 in the amount of $4,657,341.00. AR 1401–05.

On July 22, 2012, plaintiff protested the award to the Government Accountability Office (the "GAO"). AR 1587. However, because "certain important protest issues," Compl. ¶ 11, would not be addressed, plaintiff withdrew its protest prior to any decision from the GAO, AR 1926. Instead, on September 20, 2011, plaintiff filed its complaint in the United States Court of Federal Claims. In response to this action, the MCSC voluntarily stayed performance on the contract until December 1, 2011, and the court entered a briefing schedule. See Order entered Sept. 21, 2011, at 2. On October 13, 2011, defendant filed notice that the MCSC intended to take corrective action by requesting a size determination by the Small Business Administration (the "SBA"). See Def.'s Notice of Corrective Action filed Oct. 13, 2011. On October 18, 2011, the MCSC did request from the SBA a formal size determination of [redacted]. See Def.'s Notice of Action Taken Pursuant to the Court's Order of Oct. 24, 2011, Ex. 1 at App'x 2. On October 24, 2011, this court, in accordance with the parties' joint proposal, remanded the matter to the contracting officer to allow the MCSC to take action on the size determination and stayed the court action. See Order entered Oct. 24, 2011.

The SBA rendered its size determination on November 22, 2011. AR 1979. First addressing plaintiff's allegations that [redacted] is a large business, the SBA did not make an actual finding on this issue. In response to the SBA's query as the agency was investigating, intervenor made several important representations to the SBA regarding [redacted] that the SBA decided obviated the need for a size determination of [redacted]. In its November 7, 2011 letter to the SBA, intervenor acknowledged that it had listed information in its proposal concerning [redacted] past performance. AR 2127. As explained by intervenor,

> [t]he intended purpose for including the past performance of [redacted] in our proposal was to provide other relevant information as required by the proposal instructions.... Our intention ... was to either manufacture this item ourselves or thru [sic] another viable small business manufacturer. [redacted] was simply listed

---

**3.** Intervenor previously had represented that [redacted] was one of its OEMs to the MCSC in its Contractor Capability Statement submitted to Maj. Travis L. Sutton—the Contracting Officer and Source Selection Official for the procurement at issue—in response to the MCSC's Sources Sought/Request for Information. In response to the MCSC's instruction to "provide

company name, proposed team members ... and description of related competencies" intervenor explained that it was [redacted]. AR 145.

**4.** [redacted] past performance was listed in Table 3 of section II of intervenor's proposal, the table immediately preceding [redacted].

as they are the only previous supplier of the [redacted] that we listed in our proposal. We would only use [redacted] as a technical reference point if questions arose during our assembly of the item.

*Id.* In its Size Determination Memorandum dated November 22, 2011, the SBA advised the MCSC that, because intervenor "stated that it has no contractual agreements with [redacted] including ... joint venture agreements, agreements to share employees or any other agreements," and because intervenor "indicated in its response that it will not purchase any items from [redacted] for this contract" and would "find alternate sources for products that it had proposed to purchase from [redacted] in its proposal," the SBA did not proceed with a size determination of [redacted]. AR 1985.

In the course of its investigation, however, the SBA discovered that intervenor had proposed to acquire certain component parts from businesses that were classified as other than small. While examining the sources of the 524 components that were listed in the Solicitation CLINs, the SBA determined that intervenor had proposed to acquire "potentially [redacted] ... from a large business." AR 1987. Additionally, the SBA found that one proposed component part actually was manufactured in Canada and that one proposed supplier was actually a non-profit organization, which the SBA noted does "not qualify as [a] small business[ ]." *Id.* Because of these findings, the SBA concluded, as follows:

> The Small Business Administration–Area I finds JGB to be a small business which qualifies as a kit-assembler for the contract in question, and as a nonmanufacturer for orders in which it is supplying components made in the United States by a small business. JGB is an other than small business for all orders for which it is a nonmanufacturer and the component required is manufactured by a large business or not in the United States.

AR 1988.

On November 29, 2011, after review of the SBA's size determination, the MCSC decided not to disturb the contract award to intervenor. *See* Def.'s Notice of Action Taken Pursuant to the Court's Order of Oct. 24, 2011, Ex. 1 at App'x 3. The MCSC reasoned that intervenor "represented in its proposal that it will comply with all contract requirements, and the face of its proposal does not lead to the conclusion that [intervenor] will not nor cannot comply with the non-manufacturer rule." *Id.* Therefore, because "[t]he face of [intervenor's] proposal does not reflect that [redacted] will be used to furnish supplies in a way that violates the non-manufacturer rule," the MCSC deemed it unnecessary to disturb the award. *See id.* at App'x 4. This information was conveyed to the court by filing dated November 30, 2011. *See* Def.'s Notice of Action Taken Pursuant to the Court's Order of Oct. 24, 2011.

In its notice of corrective action, the MCSC also stated that, having inventoried its fuel and water storage-system items, the MCSC had "determined that it is necessary for us to begin partial performance of the contract." *Id.* Ex. 1 at App'x 5. To support this determination, William P. Macecevic, Jr., Program Manager for the Marine Corps Engineer Systems, submitted his declaration. *See id.* at Ex. 3. Mr. Macecevic indicated that the inventory for fuel-storage systems and components was "critically low" and that "[s]everal Marine Corps units ... hold stocks below the 85% of required wartime quantities and are at substantial risk of being unable to perform their operational missions." Declaration of William P. Macecevic, Jr., Nov. 29, 2011, ¶¶ 6–7. Because of this shortage, the MCSC indicated that it intended to place orders on the contract to replenish those supplies that had fallen below the 85 percent threshold for military readiness. *See id.* Ex. 3 at App'x 4–5. Plaintiff did not move to enjoin this partial performance, and on December 1, 2011, upon the expiration of the voluntary stay, the MCSC modified its initial orders and began procurement of a number of items originally listed in Delivery Order 0001 with a total cost of $29,960193.53. *See id.* Ex. 2, App'x 26.

On December 5, 2011, plaintiff filed a response to defendant's update, reiterating its position that the award of the contract to intervenor was improper for a number of reasons. *See* Pl.'s Notice Pursuant to the

Court's Order of Oct. 24, 2011 and Response to Def.'s Nov. 30, 2011 Notice of Action Taken. This court held a status conference on December 7, 2011, for the purpose, *inter alia*, of determining whether to entertain a motion for a preliminary injunction and indicated that plaintiff was likely to succeed on the merits of its misrepresentation claim. Because defendant agreed to consolidation of any request for a preliminary injunction with a hearing on the merits and final resolution of plaintiff's protest, *see* Transcript of Proceedings, *GTA Containers, Inc. v. United States*, No. 11–606C, at 27–29 (Fed.Cl. Dec. 7, 2011) ("Tr."), this court also indicated that it would not grant preliminary injunctive relief in deference to the military's assessment of urgent material needs. Subsequent to the status conference, the court ordered defendant to supplement the administrative record with the documents concerning the MCSC's and intervenor's communications with the SBA and set a briefing schedule for filing and arguing cross-motions for judgment on the administrative record that would allow for a decision by late January. *See* Order entered Dec. 7, 2011.

On December 15, 2011, defendant filed notice that the MCSC intended to cancel the contract award to intervenor on the following day. *See* Def.'s Notice filed Dec. 15, 2011. However, defendant also stated that, "[g]iven the military necessity that gave rise to the delivery order of December 1, 2011, the termination will not encompass the obligation of [intervenor] to perform that order." *Id.* The contract award was terminated accordingly, which left Delivery Order No. 0001 as the procurement vehicle, Def.'s Br. filed Jan. 6, 2012, at 16, and on December 20, 2011, defendant filed its motion to dismiss arguing that the complaint should be dismissed as moot, given that the MCSC had taken definitive action by canceling the contract, *see* Def.'s Mot. filed Dec. 20, 2011, at 1.

On December 22, 2011, plaintiff filed its motion for judgment on the administrative record, arguing at bottom that the MCSC should be required to cancel the entire procurement and that the MCSC's decision amounted to an improper partial award. Plaintiff responded to defendant's motion to dismiss on January 6, 2012, and on the same date, defendant and intervenor filed their responses and cross-motions for judgment on the administrative record. Plaintiff responded to defendant and intervenor's motions on January 13, 2012.

On January 20, 2012, the Friday preceding the scheduled January 25, 2012 argument, defendant filed Defendant's Notice of Additional Corrective Action. Defendant represented that the MCSC intended to take further corrective action and once again pare down its order placed on the contract by terminating for convenience revised Delivery Order No. 0001 for a number of the items. Def.'s Notice filed Jan. 20, 2012. By this termination the MCSC would be procuring only fuel system components at a total cost of $9,927,614.00.

## DISCUSSION

I. *Plaintiff's standing to challenge the Solicitation and mootness of plaintiff's protest*

The threshold question in any protest is whether or not plaintiff has standing to bring its grievance before the court. *See Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed.Cir.2002) ("[S]tanding is a threshold jurisdictional issue. . . . [P]rejudice (or injury) is a necessary element of standing.") To have standing to bring a protest action, the protester must demonstrate that it is an "interested party objecting to a solicitation by a Federal Agency." 28 U.S.C. § 1491(b)(1) (2006). To satisfy this standard, the "interested party" must show that it is (1) " 'an actual or prospective bidder[ ] or offeror[;]' " and (2) its " 'direct economic interest [is] affected by the award of the contract or by failure to award the contract.' " *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed.Cir.2006) (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) (adopting language of the Competition in Contracting Act, 31 U.S.C. § 3551(2) (2006))). An interested party is one "who can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States*, 577

F.3d 1375, 1378 (Fed.Cir.2009) (internal citations omitted).[5]

▮ The facts of the present case establish that plaintiff has standing to bring this challenge. Plaintiff has demonstrated that it meets both prongs of the *Rex Service* test. First, plaintiff submitted a proposal in response to the MCSC's Solicitation, *see* AR 936–57; 1047–70, and the fact that plaintiff lost the award to intervenor demonstrates that its "direct economic interest" was affected by the award decision. Further, plaintiff has demonstrated that it is an "interested party" as defined by the Federal Circuit in *Labatt*. *See* 577 F.3d at 1378. According to the Source Selection Decision Document, dated June 13, 2011, plaintiff was ranked third on non-price factors—the most important factors in the award decision—and was ranked third on price. *See* AR 1344–46. Given that the offeror that ranked second in non-price factors proposed the highest price of all seven offerors, *see id.*, plaintiff's claim that, but for the consideration of intervenor's proposal, plaintiff had a "substantial chance" of securing the award is sufficient to establish standing. *See also* AR 1606 (noting that during debriefing, contracting officer relayed to plaintiff that it was in the competitive range " 'so to speak' ").

▮ Defendant's motion to dismiss also argues that the MCSC's corrective actions moot the pending protest, thereby placing plaintiff's claims outside the court's jurisdiction. Jurisdiction must be established before the court may proceed to the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction. *Renne v. Geary*,

501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991); *DaimlerChrysler Corp. v. United States*, 442 F.3d 1313, 1318 (Fed. Cir.2006) ("[I]t is settled that a party invoking federal court jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction." (citations omitted)).

▮ As with standing, the mootness doctrine originates from the "case or controversy" requirement of Article III of the United States Constitution. *Gerdau Ameristeel Corp. v. United States*, 519 F.3d 1336, 1340 (Fed.Cir.2008) (citing *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)). Federal courts are permitted to entertain only matters in which there is an ongoing justiciable issue. *See NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed.Cir.1998). As such, mootness implicates the court's subject matter jurisdiction. *Id.* ("If a case becomes moot it no longer presents a justiciable controversy over which a federal court may exercise jurisdiction."). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (citation omitted). "Thus, to avoid dismissal for mootness, an actual controversy must remain at all stages, not merely at the time the complaint is filed." *Gerdau Ameristeel*, 519 F.3d at 1340.

▮ A case will be dismissed as moot if an intervening event during its pendency "renders it impossible for [the] court to grant any effectual relief." *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1372–73 (Fed. Cir.2000) (holding tax refund suit not moot despite plaintiff's subsequent compliance with tax refund statute because plaintiff could potentially recover additional taxes un-

---

**5.** Considerable confusion appears in the case law regarding the burden a party must carry to demonstrate "prejudice" sufficient to establish standing and the burden to demonstrate "prejudice" to succeed on the merits. *See generally Dyonyx, L.P. v. United States*, 83 Fed.Cl. 460, 465–66 n. 2 (2008) (noting that "[i]n essence, these are incongruent, although slightly overlapping, standards"); *Textron, Inc. v. United States*, 74 Fed.Cl.

277, 284–85 (2006) (summarizing Federal Circuit caselaw on the matter). "Although the prejudice requirement for standing has been satisfied by a nominal showing that a protester could compete for the contract, the prejudice requirement required for success on the merits consistently has been more stringent." *Dyonyx*, 83 Fed.Cl. at 466 n. 2 (citations omitted) (internal quotation marks omitted).

der Tucker Act rather than under tax refund claim). As explained by the United States Supreme Court, "jurisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (citations omitted). "When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law." *Id.*

■ Defendant argues that, because "the agency has terminated the underlying contract award and canceled the solicitation," the protest is now moot, regardless of the Corps's continuing limited procurement based solely on "critical military need." Def.'s Br. filed Dec. 20, 2011, at 6, 10. Defendant contends that after the MCSC took corrective action, "the controversy underlying this protest is no longer live" and "[w]hether the Marine Corps erred in its evaluation process is an academic question that does not affect the [plaintiff]." Def.'s Br. filed Jan. 20, 2012, No. 81, at 1. According to the defendant, "[i]t does not matter whether the Marine Corps made an irrational decision in awarding the contract to JGB Enterprises. Likewise, it does not matter whether the Marine Corps committed a clear and prejudicial violation of law in the procurement." *Id.*

The court finds this argument unpersuasive. Defendant essentially is contending that no contract exists because the Corps took corrective action in canceling the Solicitation, thereby mooting plaintiff's protest. Ordinarily, defendant is correct that the termination of a sued-upon contract would moot a challenge to the award of that contract. Unfortunately for defendant, that is not the case here because work is still proceeding on the awarded contract under the auspices of "military necessity." While this court does not doubt, nor take issue with, the Corps's declarations of its needs, defendant cannot have it both ways—there is no contract existing to protest, but there is one under which to make delivery orders. Thus, at the same time that defendant is attempting to argue before the court that the contract no longer is in effect, it also is arguing that "there is nothing 'improper and illegal' about the critical order for fuel systems." *Id.* at 6. Despite assertions that the contract has been canceled, defendant rationalizes that "[t]he agency had no need to resort to a sole-source procurement when it could obtain the fuel systems through an existing contract vehicle." *Id.* Consequently, this court finds that, while the MCSC has taken corrective action, that action has not mooted plaintiff's protest because it amounts to only a partial termination of the allegedly illegal contract award. A live controversy is at issue, the resolution of which will address the injury claimed by plaintiff.

II. *Standard of review in bid protest actions*

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1), granting the Court of Federal Claims jurisdiction over bid protests. *See Res. Conservation Grp., LLC v. United States,* 597 F.3d 1238, 1243 (Fed.Cir.2010); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1330–32 (Fed.Cir.2001) ("*Domenico Garufi*"). The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA"). *See* 28 U.S.C. § 1491(b)(4). The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also PGBA, LLC v. United States,* 389 F.3d 1219, 1224–28 (Fed.Cir.2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions); *see also Domenico Garufi,* 238 F.3d at 1332–33 (making applicable the standards applied in *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), and its progeny to bid protests).

■ Accordingly, as restated by the Federal Circuit, "[a] bid protest proceeds in two steps." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005). First, the court determines if, under the arbitrary and capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law[6]. *Id.; see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir.2004); *Domenico Garufi*, 238 F.3d at 1333; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *Aeroplate Corp. v. United States*, 67 Fed.Cl. 4, 8 (2005). Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack· of rational basis or violation of the law by a preponderance of the evidence. *Domenico Garufi*, 238 F.3d at 1333.

■ If the agency action is determined either to violate an applicable procurement regulation, the court proceeds to address whether the action was significantly prejudicial to the protester. *See Bannum*, 404 F.3d at 1351, 1353; *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed.Cir.2009) ("When a challenge is brought on the second ground [of the *Bannum* test], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."). Even if a plaintiff can show that a procurement violation occurred, "[t]he prejudice determination assesses whether an adjudged violation of law warrants setting aside of a contract award." *Bannum*, 404 F.3d at 1357. When making this evaluation, the court must be mindful that "[p]rejudice is a question of fact." *Bannum*, 404 F.3d at 1353; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000). "To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" *Galen Med. Assocs., Inc. v. United States*, 369 F.3d

1324, 1331 (Fed.Cir.2004) (quoting *Statistica, Inc.*, 102 F.3d at 1582); *see also Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999) (holding that in order to show prejudice, plaintiff need only show that it was within the zone of active consideration) (citing *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir.1983)). It is important to note that a plaintiff need not establish strict but-for causation in order to meet its burden of demonstrating that the agency's procurement violation was prejudicial. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

III. *Standards of review for judgment on the administrative record and for injunctive relief*

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1(c). This rule provides a procedure that allows the court to expedite a trial by using a "paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record. *Id.* at 1355–56.

■ Plaintiff seeks a permanent injunction enjoining the MCSC from continuing to procure under its emergency order, revised Delivery Order No. 0001. The Federal Circuit has described injunctive relief as "extraordinary relief." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *see CACI*, 719 F.2d at 1581. Adoption of the APA substantive standard of review did not change the court's standard for granting injunctive relief. *See PGBA*, 389 F.3d at 1225–26 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief). In order to obtain an injunction, the Federal Circuit requires a protester to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of

---

**6.** This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. *See Domenico Garufi*, 238 F.3d at 1332–33.

hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed.Cir.2009). But, "[n]o one factor, taken individually, is necessarily dispositive[,]" *FMC Corp.*, 3 F.3d at 427, and "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial," *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir.1990). But success on the merits has previously been held to be the most important factor for a court to consider when considering whether to issue injunctive relief. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed.Cir.2007).

## IV. *Material misrepresentation*

▮▮▮▮ Plaintiff's primary challenge to the award of the Contract is that intervenor made a material misrepresentation in its proposal by listing [redacted] as a supplier to be used in the completion of the procurement. In order to establish a material misrepresentation, "plaintiff must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied upon that false statement in selecting [the awardee's] proposal for the contract award." *Blue & Gold Fleet, LP v. United States*, 70 Fed.Cl. 487, 495 (2006) (citation omitted), *aff'd*, 492 F.3d 1308 (Fed.Cir.2007); *see also Sealift, Inc. v. United States*, 82 Fed.Cl. 527, 538 (2008).[7] According to the Federal Circuit,

> the submission of a misstatement … which materially influences consideration of a proposal should disqualify the proposal. The integrity of the system demands no less. Any further consideration of the proposal in these circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.

*Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed.Cir.1992) (illustrating misrepresentation tactic known as "bait and switch" in which offeror submits proposal with the intent to substitute some aspect that it had used to win award). Thus, if plaintiff can establish that (1) intervenor falsely indicated that [redacted] was a subcontractor that intervenor intended to use in the work performed under the Solicitation and (2) the MCSC relied upon this representation in the awarding of the Contract, then plaintiff has met its burden of proving a material misrepresentation.

As an initial matter, this court rejects defendant's attempts to vary the misrepresentation analysis depending on where on a procurement time line one examines the statements at issue. *See* Def.'s Br. filed Jan. 6, 2012, at 20–29. Analyzing misrepresentations that may have occurred at other stages of this protracted legal battle is unnecessary because the controlling issue is whether or not intervenor made a material misrepresentation in its proposal to the MCSC. The MCSC was entitled to rely on intervenor's representations in its response to the Solicitation, and it is irrelevant that intervenor's proposal was facially acceptable. *See id.* at 22. Defendant has mistaken the nature of the analysis called for. It is apparent that material misrepresentation claims arise from proposals that appear facially valid because an agency would make an award based on a patently obvious misrepresentation. Instead, it is the nature of a misrepresentation to appear valid on its face because that validity—indeed appeal—is what leads to reliance by the agency. Thus, courts do not examine the subjective mindset of the agency, but instead look only to whether or not the statement itself constitutes misrepresentation—something that is determinable the moment that it is submitted for agency consideration—and then whether or not the agency relied on that

---

7. This court is aware of the decision in *Northrop Grumman Corp. v. United States*, 50 Fed.Cl. 443 (2001), in which the Court of Federal Claims stated that a misstatement in a proposal "is not something to be punished unless the errors were willful and egregious." That opinion would require some proof that the awardee's actions were "sinister, not just deficient or overestimated," *id.* at 469. This grafting of additional requirements onto the standard for a material misrepresentation is not supported by binding precedent, and this court declines to impose this heightened burden.

statement in making its award decision. As long as the representation has in fact been made, then it is appropriate to apply the misrepresentation standard, regardless of when the information casting doubt on the statement came to light.

The material misrepresentation claim in this case stems from the information requested of the potential offerors in the Solicitation and the manner in which intervenor structured its proposal. The Solicitation queried offerors, regarding past performance, to provide particular information on at least "2 programs underway or completed during the past 3 years by your subcontractors similar in content and scope to that propose." AR 365. Among the information to be provided about the offeror's subcontractors was a "description of relevance to proposed work." *Id.* The MCSC informed potential offerors that past performance was the most important factor to be evaluated, and for which the Government would "evaluate how well the Offeror performed on previous *relevant* efforts of similar type." *Id.* at 367.

In response to this particular requirement in the Solicitation, intervenor devoted an entire section to past performance in its proposal. *See* AR 1154–60. According to intervenor's proposal, "Tables 3 through 5 contain past performance data for JGB suppliers." *Id.* at 1154. Table 3 was titled [redacted]. *Id.* at 1157. Under the first, "Relevance to Proposed Work," intervenor stated, [redacted] and, under the second, [redacted]. *Id.* at 1157–58. Table 4 was listed immediately beneath Table 3 and was titled [redacted]. *Id.* at 1158. Under the first "Relevance" entry, intervenor stated, [redacted]. *Id.* The second "Relevance" entry stated, [redacted]. *Id.*

This court also has examined the technical aspects of intervenor's proposal in order to appreciate fully the context in which the MCSC considered and evaluated the proposal. Under "Teaming Arrangements" intervenor stated that "JGB is the source for approximately [redacted] of the part numbers required.... The remaining are produced by a variety of [OEMs] with whom JGB has had long and successful relationships." *Id.* at 1161. As noted above, intervenor previously had communicated to the MCSC that its "key tactical fuel and water components OEMs include ... [redacted]. *Id.* at 145. Intervenor then goes on to detail a teaming arrangement with [redacted]. *Id.* at 1162. Following, under the section "Prime and Subcontractors' Roles," intervenor explained that "[s]pecific hardware suppliers will perform as subcontractors to JGB. Their role is to deliver fully compliant hardware, on time, to JGB in response to orders." *Id.*

The first issue is whether or not these quoted representations suffice to constitute a representation from intervenor that [redacted] was being proposed as a supplier—thereby meaning, based on the language of intervenor's proposal, that [redacted] would be a subcontractor on this effort. Interestingly, a consensus among the parties has emerged that these representations in intervenor's proposal do indicate that [redacted] was being offered as a supplier of [redacted] component parts. Defendant's analysis of the proposal led it to state that "[t]he only reasonable conclusion is that [redacted] was a supplier, but that JGB Enterprises would not use [redacted] to supply end items in a way that violates the small-business requirements." Def.'s Br. filed Jan. 6, 2012, at 23. Intervenor also stated that "a review of the proposal will reveal that ... JGB did mention [redacted] as a supplier." Intvr.'s Br. filed Jan. 7, 2012, at 19. This court agrees with those assessments.

Given that this court has found that intervenor did represent to the MCSC that it was proposing [redacted] as a supplier, the next issue is whether or not this representation was false or misinformation. The evidence presented—most notably in the form of the communications that intervenor had with the SBA—indicate that the proposing of [redacted] was a means utilized by intervenor to secure a high past-performance rating. In response to inquiries from the SBA, intervenor stated, as follows:

The intended purpose for including the past performance of [redacted] in our proposal was to provide other relevant information as required by the proposal instructions. In particular the [redacted] ... is an item that past procurement histo-

ry rests exclusively with [redacted]. . . . You will notice that every purchase of this item by the military since 2005 has been awarded to [redacted]. Our intention as previously stated in this letter was to either manufacture this item ourselves or thru [*sic*] another viable small business manufacturer. [redacted] was simply listed as they are the only previous supplier [redacted] that we listed in our proposal. We would only use [redacted] as a technical reference point if questions arose during our assembly of the item.

AR 2127. In light of all the evidence, this explanation is equivocal.

Intervenor's position is that it provided this information to the MCSC because in all other instances the military procured this part through [redacted]. In other words, intervenor wanted to list [redacted] in the past performance section of its proposal, not because it had a supply arrangement in place for this particular contract, but simply because the MCSC was familiar with [redacted]. This begs the obvious question why list a fact that the MCSC (1) already knows, and (2) is completely irrelevant for the manner in which intervenor intended to satisfy the demands of this procurement. The equally obvious answer is that intervenor was seeking to bolster its past-performance evaluation, given that this was the most important factor in the award under the Solicitation.

When pressed about [redacted] involvement with this procurement, intervenor stated that [redacted] would only "supply" it with technical services to help intervenor manufacture the part itself.[8] This explanation of the duties to be preformed by [redacted]is not supported by the record that was available when the representations were made to the MCSC. Absolutely no evidence in the technical section of intervenor's proposal indicates that one of the duties of its subcontractors was to act as a "technical reference point." *See* AR 1160–67. Moreover, the SBA found that "[t]here are no other indicia of potential affiliation between JGB and [redacted] such as joint venture

agreements, financial agreements or other contractual agreements." *Id.* at 1985. It is inconceivable that [redacted] would be providing technical information to a separate business without a contract in place that provides it with remuneration for its services, thereby leading this court to wonder whether [redacted] is even aware of the role that intervenor has assigned to it. Based on the evidence presented, this court finds that the listing of [redacted] as a supplier in the proposal was a misrepresentation of the role that [redacted] was to play in performance should intervenor win the award, given that intervenor explicitly stated to the SBA that it was never intervenor's intent to use [redacted] as a supplier of the parts for which it listed past performance.

The final issue is whether or not the MCSC relied on the misrepresentation when making the award decision. Again, the answer must be in the affirmative based upon the TET's narrative evaluation of intervenor. *See* AR 1297–98. Under the past performance evaluation section, the TET gave intervenor a[redacted] rating based on [redacted]. *Id.* at 1297. Although this statement by itself is vague, the technical factor evaluation narrative provides the necessary context. In giving intervenor an [redacted] technical rating, the TET stated, "Teaming arrangements with: [redacted]. Proposed work by prime and subcontractors adequately addressed." *Id.* at 1298. It is not at all apparent why the MCSC inferred a teaming arrangement between [redacted] and intervenor. However, what that explanation does show is that MCSC placed great emphasis on the fact that [redacted] involvement was delineated in intervenor's proposal, and, consequently, the TET awarded intervenor high marks in the two most important evaluation factors. Defendant even concedes that "the Marine Corps based its evaluation in part upon its belief that [redacted] was a supplier in some capacity." Def.'s Br. filed Jan. 6, 2012, at 25. In addition, this court notes that the MCSC was justified in thinking that the listing of [redacted] past-performance information in-

---

**8.** Intervenor represented during oral argument that, in fact, [redacted] was the only manufactur- er for these component parts.

dicated that it was being proposed as a subcontractor, given that the instructions in the Solicitation required potential offerors to list past performance information for "your subcontractors." AR 365. The MCSC can be excused for not assuming that [redacted] was being listed simply because it had previously supplied the Corps with those component parts on separate, unrelated occasions. In fact, this is the only rational way to interpret intervenor's listing [redacted] past performance.

Therefore, this court finds that plaintiff has met its burden by showing that intervenor made a material misrepresentation in listing [redacted] past performance; that this constitutes a clear violation of an applicable procurement regulation, FAR 52.212–2; that intervenor represented to the MCSC that [redacted] was being proposed as a supplier and a subcontractor for this procurement; and that the MCSC's evaluation showed that the agency relied on the misrepresentation in evaluating intervenor's past performance, which was prejudicial to plaintiff.

## V. Other factors warranting injunctive relief

 Intervenor's continued performance on the illegally awarded contract will cause plaintiff irreparable harm in the form of economic loss and monetary damages for lost profits. Recovery of bid and proposal costs would do little, if anything, to compensate for the loss.

In balancing the relative harms, the court recognizes that the MCSC knew about the issues resulting from intervenor's utilization of [redacted] before it permitted performance of Delivery Order 0001 to resume. Accordingly, defendant and intervenor readily assumed the risk of harm that they would suffer if an injunction is granted. The harm to plaintiff, however, stems from the MCSC's failure to consider intervenor's misrepresentation and noncompliance with a statutory requirement. The violation of the applicable procurement regulation was prejudicial.

Finally, the court must consider the effect—if any—of an injunction on the public interest. National defense and national security concerns will be considered in tandem with concerns for the public interest and the integrity of the procurement system. In this regard, the court takes into account applicable procurement regulations, including SBA regulations. Notably, SBA's size determination appears to require termination of intervenor's current contract. The public interest favors requiring the Government to follow its procurement regulations. *See Sys. Application & Techs., Inc. v. United States,* 100 Fed.Cl. 687, 721–22 (2011). Given the SBA's determination and the fact that the MCSC has continued its contract with intervenor, it is apparent that an injunction halting performance actually would promote the public interest.

## VI. "Due regard to the interests of national security"

The final issue governing injunctive relief—determining that the grant of an injunction serves the public interest—implicates 28 U.S.C. § 1491(b)(3), which provides that, in exercising its bid-protest jurisdiction, "the court[ ] shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3); *see also Linc Gov't Servs., LLC v. United States,* 96 Fed.Cl. 672, 702 (2010) ("[W]hen military and national security interests are implicated, the public interest factor gains 'inflated' importance in the court's balancing of the equities." (citation omitted)). Nonetheless, when the Government makes a claim of national security, as it has done in this protest, a " '[c]ourt will not blindly accede to such claim[redacted].' " *Gentex Corp. v. United States,* 58 Fed.Cl. 634, 655 (2003) (quoting *Harris Corp. v. United States,* 628 F.Supp. 813, 822 n. 13 (D.D.C.1986)). It must, however, give the claim "the most careful consideration," *id.,* while evaluating it "with the same analytical rigor as other allegations of potential harm to parties or the public." *Id.* (citation omitted).

Defendant's interpretation of § 1491(b)(3)'s admonition, as elaborated upon during argument, is that the MCSC has tailored its procurement needs in Defendant's Notice of Additional Corrective Action to take account of critical and minimal military

needs. The problem with this approach is that the Government is seeking to equate "due regard" to abstention from consideration. In other words, defendant reasons that, because the MCSC has taken ongoing corrective action to delimit this procurement to its absolute minimum in terms of exigent need, the "corrected" scope of procurement should proceed. Defendant explained in its most recent brief:

> The Marine Corps should have included those items in its termination action of December 15, 2011, because it intended for the termination to encompass all of the awarded contract that did not depend upon a military need for which there is not an alternative contract vehicle. With this additional termination action, the order for critical items includes only the fuel systems: the Tactical Airfield Fuel Dispensing System, the Amphibious Assault Fuel System, and the Expeditionary Refueling System. Those systems cost approximately $9,927,614.00. *This should have been the order from the start.*

Def.'s Br. filed Jan. 20, 2012, at 16 (emphasis added). And, defendant might add, plaintiff has been wasting its time ever since the start, given this outcome. Defendant candidly expressed during argument that, without admitting error, the MCSC "has tailored an injunction on itself."

This position is one step away from the argument that the Government advocated recently in *Ceradyne, Inc. v. United States,* 103 Fed.Cl. 1 (2011). According to Judge Firestone, the Government argued that "the court has discretion to voluntarily refrain from exercising jurisdiction over this matter, regardless of any other facts at issue in the merits." *Id.* at 12, n. 8. The protester in *Ceradyne* countered, according to the judge, that "such concerns are only properly raised in the context of evaluating whether or not to grant injunctive relief to a successful claimant." *Id.* Judge Firestone did not reach the issue, but this court must and holds that the jurisdictional statute states in as plain English as Congress ever proffers that the interests of national defense and national security must be accorded due re-

gard in determining whether to award injunctive relief.

This court cannot emphasize more forcefully that no court, least of all this jurist, presumes to dictate to the Marine Corps its assessment of military needs—whether in equipping itself to respond to contingencies or to exigent circumstances in actual theaters of war. What the Court of Federal Claims should accomplish, however, is an evaluation of a protester's arguments that the showing should be found wanting, and the court proceeds to do so.

The Macecevic Declaration does not justify withholding injunctive relief for two reasons: First, it does not explore available alternatives other than "[s]cavenging parts" or procuring through the Defense Logistics Agency, which would mean "up to twice as long till delivery." Macecevic Decl. ¶ 11. Other alternatives do exist. Fundamentally, the MCSC wants to procure competitively and fulfill its needs under the competitive contract that formed the basis of Delivery Order 0001. *See* Def.'s Br. filed Jan. 20, 2012, No. 81, at 6–7 ("[T]he Marine Corps did much more than that [i.e., investigate a sole-source award] by using the competitive process . . . .").

Second, the MCSC acknowledges that other procurement vehicles, such as a sole-source contact, are available; it just does not want to use them because it is fostering the goals of competition by proceeding on a limited basis with an awardee that would not be in that position absent a material misrepresentation. On this record the interests of national defense and national security do not prevail over upholding the integrity of the procurement process to redress a material misrepresentation. The MCSC's preference for a particular procurement scheme is not the same as demonstrating a necessary contractual instrument. Defendant has noted the MCSC's concerns about plaintiff's ability to perform the contract, but the relief awarded does not mandate that the MCSC procure the three systems from plaintiff. The scope of the injunction prevents fulfilling these particular needs through intervenor and nothing more.

In terms of timing, plaintiff cannot be faulted for delaying the award or delivery of the items sought by the Solicitation. The record supports a finding that plaintiff has not been dilatory. In fact, when the court discussed with the parties on December 7, 2011, whether it would issue a preliminary injunction if plaintiff moved for one to halt the procurement of the $30–million order from intervenor, the court put defendant and the MCSC on notice that it would not entertain a complaint of delay or more aggravated exigent circumstances when briefing, argument, and decision on a consolidated proceeding for preliminary and permanent injunctive relief were scheduled to be completed by late January 2012. *See* Transcript of Proceedings, *GTA Containers, Inc. v. United States*, No. 11–606C (Fed.Cl. Dec. 7, 2011), at 30–35. It is true that plaintiff never moved for injunctive relief, but, given the rapid and changing developments in this case, including two corrective actions and a retrench from a $47–million procurement to $30 million and then to $9.9 million, all involving different items, plaintiff was in no position to move until the SBA confirmed that intervenor did not qualify to supply a number of components under the Solicitation. When plaintiff came into court, it faced Mr. Macecevic's Declaration which was based on a $30–million draft order for "[e]ssential components and systems with critical deficiencies as of 30 November 2011. This order represents the minimum quantity necessary to achieve satisfactory material readiness for combat units." Macecevic Decl. Ex. 2. (The order had been placed on December 1, 2011, calling for delivery on April 29, 2012, according to defendant's representations during oral argument.) Faced with that showing, and the imminence of resolving the matter on a yet-to-be-briefed record to be supplemented by the documents submitted to, and generated by, the SBA, the court advised that it would not be inclined to grant a preliminary injunction.

What occurred in the interim, according to defendant, was that the MCSC issued its order for the $9.9–million truncated procurement as of January 23, 2012, when it canceled that part of Delivery Order 0001 covering components. Defendant insists that the MCSC did not issue a new or revised order; it merely modified the prior order that had been placed on the competitively awarded contract. Therefore, in this particular case national defense interests should not obviate the defective award.

## CONCLUSION

Accordingly, based on the foregoing,

1. Defendant's motion to dismiss is denied.

2. Plaintiff's cross-motion for judgment on the administrative record is granted, and defendant's and intervenor's cross-motions for judgment on the administrative record are denied.

3. Having held argument on January 25, 2012, and attempting to incorporate the parties' oral arguments to the extent possible, and with due regard for the need to issue an order enjoining contract performance if plaintiff established entitlement thereto, and recognizing that an opinion should issue to address other arguments made by the parties, the court will issue an opinion postjudgment that shall be considered in support of the judgment. *See Sierra Applied Scis. v. Advanced Energy Indus.*, 363 F.3d 1361, 1370 & n. 1 (Fed.Cir.2004) (labeling as "nonsense" argument that district court lacked jurisdiction to enter opinion judgment after court had ruled from bench and indicated that a " 'more detailed and thorough opinion' " would follow entry of judgment.) The court advised the parties during argument that, if it were to issue an order and judgment for a permanent injunction, such action would be followed by a comprehensive opinion in due course, which should be by no later than February 3, 2012.

4. Defendant, through the Marine Corps Systems Command, its officers, agents, employees, and all other persons acting in connection therewith shall not proceed with performance of Delivery Order 0001 issued under Contract M67854–11–D–5030 awarded under Solicitation No. M67854–11–R–5030 on July 6, 2011, to J.G.B. Enterprises, Inc., and the contracting officer shall direct J.G.B. to cease performance thereunder.

5. The Clerk of the Court shall enter judgment declaring the award to intervenor to be unlawful and enjoining performance under Delivery Order 0001 consistent with the foregoing.

6. By February 3, 2012, the parties shall identify by brackets any material subject to redaction before the order issues for publication.

**IT IS SO ORDERED.**